UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TENNESSEE ENVIRONMENTAL COUNCIL,
TENNESSEE SCENIC RIVERS
ASSOCIATION, SIERRA CLUB, and
CENTER FOR BIOLOGICAL DIVERSITY,
Plaintiffs,

v.                                                      No. 3:13-cv-00383

TENNESSEE VALLEY AUTHORITY,
Defendant.

## DEFENDANT TENNESSEE VALLEY AUTHORITY'S ANSWER

Defendant Tennessee Valley Authority (TVA) responds to Plaintiffs' Complaint as follows.

### NATURE OF THE CASE

1.      Answering the allegations of paragraph 1, TVA admits that the Complaint challenges TVA's actions, but denies the substance of those allegations.

2.      Denied.

3.      Answering the allegations of paragraph 3, TVA states that it prepared an Environmental Assessment, determined the proposed action would have no significant effect on the environment, and therefore prepared no Environmental Impact Statement.  Except as expressly admitted, the allegations of paragraph 3 are denied.

4.      Denied.

5.      Denied.

6.      Paragraph 6 describes Plaintiffs' request for relief; TVA denies Plaintiffs are entitled to the requested relief or any relief.

## JURISDICTION AND VENUE

7. Admitted.

8. TVA admits that venue is proper in this district, but states that this action should be transferred to the Eastern District of Tennessee under 28 U.S.C. § 1404(a) for the reasons stated in TVA's Motion to Transfer Venue. (Docs. 17, 18.)

## PARTIES AND STANDING

### Plaintiffs

9. Upon information and belief, TVA admits the allegations of paragraph 9.

10. Upon information and belief, TVA admits the allegations of the first and second sentences of paragraph 10. TVA denies the remaining allegations of paragraph 10.

11. Upon information and belief, TVA admits the allegations of paragraph 11.

12. Upon information and belief, TVA admits the allegations of paragraph 12.

13. Upon information and belief, TVA admits the allegations of paragraph 13.

14. Upon information and belief, TVA admits the allegations of paragraph 14.

15. Upon information and belief, TVA admits the allegations of paragraph 15.

16. Upon information and belief, TVA admits the allegations of paragraph 16.

17. Upon information and belief, TVA admits the allegations of the first sentence of paragraph 17. TVA denies the remaining allegations of paragraph 17.

18. Upon information and belief, TVA admits the allegations of the first and second sentences of paragraph 18. TVA denies the remaining allegations of paragraph 18.

19. Answering the allegations of paragraph 19, TVA admits upon information and belief that Sierra Club has the stated interests and has taken the stated actions. Except as expressly admitted, the allegations of paragraph 19 are denied.

20. Denied.

21.     Upon information and belief, TVA admits the allegations of paragraph 21.

22.     Upon information and belief, TVA admits the allegations of paragraph 22.

23.     Denied.

## Defendant

24.     Answering the allegations of the third sentence of paragraph 24, TVA states that the United States government owns the Gallatin Fossil Plant and entrusts it to TVA's custody and control.  All remaining allegations of paragraph 24 are admitted.

## LEGAL BACKGROUND

## The National Environmental Policy Act

25.     TVA admits that the statutory and regulatory language in paragraph 25 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 25 are denied.

26.     TVA admits that the regulatory language contained in paragraph 26 is accurately quoted in part and that NEPA, the regulations promulgated pursuant to NEPA, and TVA's NEPA procedures speak for themselves.  Except as expressly admitted, the allegations of paragraph 26 are denied.

27.     TVA admits that the statutory and regulatory language contained in paragraph 27 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 27 are denied.

28.     TVA admits that the regulatory language contained in paragraph 28 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 28 are denied.

29.     TVA admits that the regulatory language contained in paragraph 29 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 29 are denied.

30.     Denied; TVA's NEPA procedures speak for themselves.

31.     TVA admits that the regulatory language contained in paragraph 31 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 31 are denied.

32.     TVA admits that the statutory and regulatory language contained in paragraph 32 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 32 are denied.

33.     TVA admits that the regulatory language contained in paragraph 33 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 33 are denied.

34.     TVA admits that the referenced regulation encourages agencies to tier from broad environmental impact statements to environmental assessments that "shall concentrate on the issues specific to the subsequent action."  Except as expressly admitted, the allegations of paragraph 34 are denied.

35.     TVA admits that the regulatory language contained in paragraph 35 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 35 are denied.

36.     TVA admits that the regulatory language contained in paragraph 36 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 36 are denied.

## The Administrative Procedure Act

37.     Answering the allegations of paragraph 37, TVA admits that the Administrative Procedures Act governs judicial review of an agency's compliance with NEPA.  Except as expressly admitted, the allegations of paragraph 37 are denied.

38.     TVA admits that the statutory language contained in paragraph 38 is accurately quoted in part and that the APA speaks for itself.  Except as expressly admitted, the allegations of paragraph 38 are denied.

## FACTUAL BACKGROUND

39.     Answering the allegations of paragraph 39, TVA admits that Plaintiffs' lawsuit challenges TVA's action to install emission controls and related facilities at Gallatin, but denies the substance of those allegations.

## The Gallatin Fossil Plant

40.     Admitted.

41.     Admitted.

42.     Denied.

43.     Answering the allegations of paragraph 43, TVA admits that currently approximately 185,000 tons of fly ash and approximately 46,500 tons of bottom ash are wet-sluiced to Gallatin's surface impoundments each year.  Except as expressly admitted, the allegations of paragraph 43 are denied.

44.     Answering the allegations in the first sentence of paragraph 44, TVA admits that fly ash and bottom ash contain a broad range of naturally occurring metals.  TVA is without sufficient knowledge to admit or deny the allegations in the second sentence of paragraph 44 as no citation to any EPA finding is provided.  Except as expressly admitted, the allegations of paragraph 44 are denied.

45.     Answering the allegations of paragraph 45, TVA admits that in 2011 it reported to the Toxics Release Inventory that it disposed of 2,551,211 pounds of chemicals onsite at Gallatin.  Except as expressly admitted, the allegations of paragraph 44 are denied.

46.     TVA is without knowledge to admit or deny the allegations of paragraph 46, and therefore denies those allegations.

47.     Answering the allegations of paragraph 47, TVA admits that Gallatin is permitted under National Pollutant Discharge Elimination System (NPDES) Permit Number TN0005428 to discharge wastewater from the ash pond through Outfall 001 and from the condenser cooling wastewater discharge channel through Outfall 002, that approximately 27.9 million gallons per day are discharged through Outfall 001 and 923 million gallons per day are discharged through Outfall 002, and that TVA monitors and reports discharges of 16 metals in conformity with its NPDES permit.  Except as expressly admitted, the allegations of paragraph 47 are denied.

48.     Admitted.

49.     Answering the allegations of paragraph 49, TVA admits that the application cited reports that 932.81 million gallons of effluent are discharged per day through NPDES Outfall 2.  Except as expressly admitted, the allegations of paragraph 49 are denied.

50.     Admitted.

51.     TVA admits that most of the water withdrawn by the Gallatin plant is used for cooling water, but denies the remaining allegations of paragraph 51.

52.     Answering the allegations of paragraph 52, TVA states after the installation of the emission control equipment analyzed in the Environmental Assessment, direct emissions of $CO_2$ may be reduced by 6%, NOx emissions by 90%, and $SO_2$ emissions by 96%.  Except as expressly admitted, the allegations of paragraph 52 are denied.

53.     Answering the allegations of paragraph 53, TVA admits that there is a Wildlife Management Area on the Gallatin Fossil Plant reservation. Except as expressly admitted, the allegations of paragraph 53 are denied.

54.     Answering the allegations in the first and fifth sentences of paragraph 54, TVA states the only species federally listed as endangered, threatened, or of other conservation concern known to occur at the Gallatin site is the Indiana bat. Answering the allegations in the second, third, and fourth sentences of paragraph 54, TVA states that it has committed to relocate the Cumberland River Aquatic Center (CRAC) to another location on the Gallatin plant site, farther away from the plant and the project footprints, has committed to provide the Tennessee Wildlife Resources Agency (TWRA) a longer term tenure over the new CRAC site which is expected to enhance TWRA's species propagation activities, and has consulted with the U.S. Fish and Wildlife Service which concurred that the Gallatin project with associated commitments from TVA, are not likely to adversely affect any listed species. Except as expressly admitted, the allegations of paragraph 54 are denied.

### Defendant's Obligation to Retrofit or Retire the Gallatin Plant

55.     Denied.

56.     Answering the allegations of paragraph 56, TVA admits that it entered into Federal Facilities Compliance Agreement (FFCA) with the EPA, and a virtually identical Consent Decree with four states (Alabama, Kentucky, North Carolina, Tennessee), and three environmental advocacy groups (Sierra Club, National Parks Conservation Association, Our Children's Earth Foundation), that the Consent Decree was approved and entered by the United States District Court for the Eastern District of Tennessee and is on file with this Court (Doc. 18-1) and speaks for itself, and that TVA made no admission of liability under either the FFCA or Consent Decree. Except as expressly admitted, the allegations of paragraph 56 are denied.

57. Answering the allegations of paragraph 57, TVA admits that the FFCA and the Consent Decree specified retirement dates for 18 of TVA's 59 coal-fired units, allowed TVA the discretion to decide whether to install pollution controls, retire or retrofit to biomass other of its units by specified dates, and provided TVA the discretion to control, retire, or retrofit the four Gallatin units by December 31, 2017. Except as expressly admitted, the allegations of paragraph 57 are denied.

58. Answering the allegations of paragraph 58, TVA states that the Mercury and Air Toxics Standards rule, 77 Fed. Reg. 9,304 (Feb. 16, 2012) speaks for itself. Except as expressly admitted, the allegations of paragraph 58 are denied.

59. Answering the allegations of paragraph 59, TVA states that on August 18, 2011, the TVA Board of Directors approved the installation of dry flue gas desulfurization systems, pulse jet fabric filters, selective catalytic reduction systems, and associated equipment at Gallatin with a budget up to $1.1 billion "subject to satisfactory completion of all required environmental reviews under the National Environmental Policy Act and other applicable environmental reviews." Except as expressly admitted, the allegations of paragraph 59 are denied.

### The Life Extension Project

60. Answering the allegations of paragraph 60, TVA admits that the action that is the subject of the Environmental Assessment at issue in this lawsuit includes the listed components, but denies that the installation of these emissions controls are a "life extension project."

61. Answering the allegations of paragraph 61, TVA admits that the installation of these emissions controls will substantially reduce air emissions from the Gallatin plant, and denies all remaining allegations of paragraph 61.

62. Answering the allegations of paragraph 62, TVA admits that installing additional controls to reduce emissions at Gallatin is expected to increase the amount of coal combustion

waste in amounts that will vary depending on how much Gallatin is operated up to the amounts alleged in paragraph 62. Except as expressly admitted, the allegations of paragraph 62 are denied.

63. Answering the allegations of paragraph 63, TVA admits that the concentration of metals in plant discharges may increase although the volume is expected to decrease and concentrations are not expected to exceed the most stringent water quality standards. Except as expressly admitted, the allegations of paragraph 63 are denied.

64. Answering the allegations of paragraph 64, TVA states that coal combustion residue will be stored in the newly constructed North Rail Loop Landfill (NRL), and, in the event the NRL begins to approach full capacity, TVA would take steps to construct a South Rail Loop landfill after conducting additional hydrogeologic studies, developing a landfill design, obtaining a solid waste disposal permit, and conducting additional environmental reviews as appropriate. Except as expressly admitted, the allegations of paragraph 64 are denied.

65. Answering the allegations of paragraph 65, TVA admits that the maximum height of the coal combustion residue facility would result in an active stack elevation of 695 feet above mean sea level. Except as expressly admitted, the allegations of paragraph 65 are denied.

66. Answering the allegations of paragraph 66, TVA admits that the landfill would be located on part of the Wildlife Management Area on the Gallatin Fossil Plant reservation. Except as expressly admitted, the allegations of paragraph 66 are denied.

67. Answering the allegations of paragraph 67, TVA states that the area open to hunting on the Wildlife Management Area was reduced from over 900 acres to 229 acres when the Wildlife Management Area lease was renewed effective December 31, 2011, in order to minimize potential conflict and safety concerns due to the frequent presence of personnel in the area who were conducting sampling and surveys necessary to evaluate the feasibility of the area

for the proposed landfills. Except as expressly admitted, the allegations of paragraph 67 are denied.

68.     Answering the allegations of paragraph 68, TVA admits the planned coal combustion residue management facilities are expected to be able to accommodate the residue produced at the plant for approximately 20 years, that the initial estimate of the NRL landfill life is between seven and fifteen years, and that in the event the NRL begins to approach full capacity, TVA would take steps to construct the South Rail Loop landfill, including additional hydrogeologic studies, landfill design, obtaining a solid waste disposal permit, and conducting additional environmental reviews as appropriate. Except as expressly admitted, the allegations of paragraph 68 are denied.

69.     Answering the allegations of paragraph 69, TVA admits that there is potential for karst features to occur around the South Rail Landfill (SRL) area where Carters Limestone is exposed to the surface, but, if the SRL landfill is constructed, its design will include a seep collection system, karst remediation, liner system, leachate management system, and geosynthetic cap system, and, additionally, a 40-foot wide haul road and a 30-foot wide access road would be constructed around the landfill perimeter. Except as expressly admitted, the allegations of paragraph 69 are denied.

70.     Answering the allegations of paragraph 70, TVA admits that the possibility and timing of the development of the SRL will vary depending on factors such as energy demand, quantity of coal burned in Gallatin Units 1-4, dry coal combustion residue production, and the amount of combustion residue marketed for beneficial uses, but that in the event the NRL begins to approach full capacity, TVA would take steps to construct the SRL landfill including additional hydrogeologic studies, landfill design, obtaining a solid waste disposal permit, and

conducting additional environmental reviews as appropriate. Except as expressly admitted, TVA denies the allegations of paragraph 70.

71. TVA denies the allegations of paragraph 71 because TVA both summarized its project criteria and analysis of alternative sites in Section 2.4.1 of the Final EA, and included its analysis of the four on-site locations in the Administrative Record which will be filed with the Court.

72. Answering the allegations of paragraph 72, TVA admits that the projects would result in filling approximately 2.24 acres of wetlands, that the amount of wetlands potentially impacted was reduced by changes in project design, that the impacted wetlands have only moderate to limited wetland functions, and that the loss of wetlands would be mitigated at a two to one ratio (two acres of wetlands would be protected elsewhere for every acre impacted at Gallatin). Except as expressly admitted, TVA denies the allegations of paragraph 72.

73. Answering the allegations of paragraph 73, TVA admits that based on the Hydrologic Evaluation of Landfill Performance (HELP) model, the estimated average daily leachate flow from the proposed landfill would be approximately 0.026 million gallons per day (MGD) with a maximum peak flow of 0.30 MGD, and the estimated daily flow stormwater runoff of 0.34 MGD. Except as expressly admitted, the allegations of paragraph 73 are denied.

74. Answering the allegations of the first sentence of paragraph 74, TVA admits that new stormwater streams would be produced from the operation of the scrubber, but because the scrubber would use dry ash handling instead of wet handling, the net stormwater discharges should decrease. Answering the allegations of the second sentence of paragraph 74, TVA admits that ammonia would be added to wastewater streams from the SCR, but denies that this would create the potential for releases of dangerous levels of ammonia because discharges would be required to meet NPDES limits, and would be monitored and treated prior to discharge.

Answering the allegations of the third sentence of paragraph 74, TVA denies that discharges of copper could exceed the instream Water Quality Criteria, and admits that although, under the HELP model and affiliated mass balance analysis, levels of thallium appear to exceed the lowest instream Water Quality Criteria, this is because the detection level for NPDES-approved thallium sampling methods is higher than the criterion; TVA further states that no thallium has been detected in any ash pond discharges from Gallatin. Except as expressly admitted, the allegations of paragraph 74 are denied.

75. Denied.

76. Denied.

77. Answering the allegations of paragraph 77, TVA states that it has committed to relocate the Cumberland River Aquatic Center (CRAC) at another location on the Gallatin plant site farther away from the plant and the project footprints, has committed to provide the Tennessee Wildlife Resources Agency (TWRA) a longer term tenure over the new CRAC site which is expected to enhance TWRA's species propagation activities, and has consulted with the U.S. Fish and Wildlife Service which concurred that the Gallatin projects with associated commitments from TVA, are not likely to adversely affect any listed species. Except as expressly admitted, the allegations of paragraph 77 are denied.

78. Answering the allegations of paragraph 78, TVA states that has committed to relocate the Cumberland River Aquatic Center (CRAC) at another location on the Gallatin plant site farther away from the plant and the project footprints, has committed to provide the Tennessee Wildlife Resources Agency (TWRA) a longer term tenure over the new CRAC site which is expected to enhance TWRA's species propagation activities, and has consulted with the U.S. Fish and Wildlife Service which concurred that the Gallatin projects with associated

commitments from TVA, are not likely to adversely affect any listed species. Except as expressly admitted, the allegations of paragraph 78 are denied.

79.     TVA is without knowledge to admit or deny the allegations of paragraph 79, and therefore denies those allegations.

80.     TVA denies that the lake sturgeon is federally listed as endangered or threatened, but admits that continued operation of the Cumberland River Aquatic Center operated by the Tennessee Wildlife Resources Agency either where currently located or where relocated could impact the species. Except as expressly admitted, the allegations of paragraph 80 are denied.

81.     Denied.

82.     Denied.

### Defendant's Decision-Making Process

83.     Denied.

84.     Answering the allegations of paragraph 84, TVA admits that in March 2011 it issued its Integrated Resource Plan and associated EIS that describes how TVA would meet the electric power demands in its service area for the next 20 years while fulfilling its mission of providing low-cost, reliable power, environmental stewardship, and economic development. Except as expressly admitted, the allegations of paragraph 84 are denied.

85.     Answering the allegations of paragraph 85, TVA admits that the language from the TVA Board of Directors' August 18, 2011 resolution is accurately quoted in part, but denies all remaining allegations of paragraph 85.

86.     Answering the allegations of paragraph 86, TVA admits it conducted such analyses, but denies that this was done "outside the NEPA process," and is unable to admit or deny the accuracy of the quotation because the referenced letter is not identified. Except as expressly admitted, the allegations of paragraph 86 are denied.

87.    Answering the allegations of the first and second sentences of paragraph 87, TVA states that it is unable to admit or deny the accuracy of the quoted language because the referenced letter is not identified, but admits it conducted computer analyses which it summarized in the EA but did not share with the public because those analyses contain sensitive business information such as plant performance and projected fuel pricing and projections that are protectable under the Freedom of Information Act.  Answering the allegations of the last sentence of paragraph 87, TVA admits that these analyses were one factor that contributed to TVA's decision to proceed with Alternative 2.  Except as expressly admitted, the allegations of paragraph 86 are denied.

88.    TVA denies the allegations in the first three sentences of paragraph 88, but is without sufficient knowledge to admit or deny the allegations in the last sentence of paragraph 88.

89.    Answering the allegations of paragraph 89, TVA admits that it entered into contracts related to the Gallatin projects before the NEPA process was completed but states that those contracts are cancelable at any time for TVA's convenience.  Except as expressly admitted, the allegations of paragraph 89 are denied.

### The Draft Environmental Assessment

90.    Answering the allegations of paragraph 90, TVA admits that it issued its Draft Environmental Assessment on October 17, 2012.  Except as expressly admitted, the allegations of paragraph 90 are denied.

91.    Answering the allegations of paragraph 91, TVA states neither NEPA nor applicable regulations or procedures requires a public hearing or scoping for Environmental Assessments.  Except as expressly admitted, the allegations of paragraph 91 are denied.

92.     Answering the allegations of paragraph 92, TVA admits that in accordance with NEPA and applicable procedures or regulations, TVA discussed alternatives to its proposed actions in varying levels of detail in its Environmental Assessment.  Except as expressly admitted, the allegations of paragraph 92 are denied.

93.     Answering the allegations of paragraph 93, TVA admits that some of the Plaintiffs submitted comments on the Draft EA to TVA that contained the allegations listed, but denies the substances of those allegations.

94.     Answering the allegations of paragraph 94, TVA admits that Sierra Club and other environmental advocacy groups submitted a second round of comments on the Draft EA which TVA agreed to consider and include in the administrative record, that those comments included some of the allegations contained in paragraph 94, but denies the substance of those allegations.  Except as expressly admitted, the allegations of paragraph 94 are denied.

95.     Answering the allegations of paragraph 95, TVA admits that it received 1,199 comment submissions; approximately 300 of those 1,199 comments were pre-printed postcards distributed by the Sierra Club, and 555 of those 1,199 comments were form emails generated through a Sierra Club website.  Except as expressly admitted, the allegations of paragraph 95 are denied.

## The Final Environmental Assessment and Decision

96.     Admitted.

97.     Admitted that Mr. Johnson approved proceeding with the Gallatin projects, stating that "it was a close question whether to proceed with the projects."  Except as expressly admitted, the allegations of paragraph 97 are denied.

98.     TVA admits that after completing an Environmental Assessment, including consideration of comments from the public and other agencies, TVA determined that the Gallatin

projects would not significantly impact the environment. Except as expressly admitted, the allegations of paragraph 98 are denied.

99. Answering the allegations of paragraph 99, TVA admits that, in conformity with NEPA regulations and guidance, it analyzed a "no action alternative" under which TVA would continue current operation of the Gallatin units without additional emission controls, but this option was dismissed as unreasonable because it would not comply with EPA's Mercury and Air Toxics Standards rule, 77 Fed. Reg. 9,304 (Feb. 16, 2012) or the FFCA and related Consent Decree and would be inconsistent with TVA's goals of providing cleaner, reliable and affordable energy to support sustainable economic growth in the Tennessee Valley. Except as expressly admitted, the allegations of paragraph 99 are denied.

100. TVA admits the allegations in the first sentence of paragraph 100. Except as expressly admitted, the allegations of paragraph 100 are denied.

101. Answering the allegations of the first sentence of paragraph 101, TVA admits that it relied on analyses done as part of its 2011 IRP and associated Environmental Impact Statement as well as subsequent analyses in its evaluation of the retirement of the Gallatin units, but denies that the IRP analyses failed to analyze the option of retiring Gallatin units because these analyses ranked each of TVA's coal units based on detailed performance metrics and cost studies and, on the basis of those studies, all four of the Gallatin units were ranked in the highest grouping which was for high-performing and reliable units with relatively low operational costs and which provide TVA operational flexibility with their ability to provide both baseload and load-following roles. Answering the allegations in the second and third sentences of paragraph 101, TVA admits that it summarized these analyses in the Gallatin EA and did not share these analyses with the public because the analyses contain sensitive business information such as plant performance and projected fuel pricing and projections that are protectable under the

Freedom of Information Act. Except as expressly admitted, the allegations of paragraph 101 are denied.

102. Denied.

103. Denied.

## FIRST CLAIM FOR RELIEF

### (Violation of NEPA and APA – Pre-Determination of Decision)

104. TVA incorporates its responses to the preceding paragraphs as if set forth in full.

105. TVA admits that the regulatory language contained in paragraph 105 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves. Except as expressly admitted, the allegations of paragraph 105 are denied.

106. Denied.

107. Denied.

108. Denied.

109. Denied.

## SECOND CLAIM FOR RELIEF

### (Violation of NEPA and APA – Committing Resources Before Completing the NEPA Process)

110. TVA incorporates its responses to the preceding paragraphs as if set forth in full.

111. TVA admits that the regulatory language contained in paragraph 111 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves. Except as expressly admitted, the allegations of paragraph 111 are denied.

112. TVA admits that the regulatory language contained in paragraph 112 is accurately quoted in part with respect to Environmental Impact Statements and that NEPA and the

regulations promulgated pursuant to NEPA speak for themselves. Except as expressly admitted, the allegations of paragraph 112 are denied.

113.    TVA admits that the regulatory language contained in paragraph 113 is accurately quoted in part with respect to Environmental Impact Statements and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves. Except as expressly admitted, the allegations of paragraph 113 are denied.

114.    Denied.

115.    Denied.

116.    Denied.

## THIRD CLAIM FOR RELIEF

### (Violation of NEPA and APA – Failure to Prepare an EIS for the Life Extension Project)

117.    TVA incorporates its responses to the preceding paragraphs as if set forth in full.

118.    TVA admits that the regulatory language contained in paragraph 118 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves. Except as expressly admitted, the allegations of paragraph 118 are denied.

119.    Denied.

120.    Denied.

121.    Answering the allegations of paragraph 121, TVA admits that it received 1,199 comment submissions; approximately 300 of those 1,199 comments were pre-printed postcards distributed by the Sierra Club, and 555 of those 1,199 comments were form emails generated through a Sierra Club website. Except as expressly admitted, the allegations of paragraph 121 are denied.

122.    Denied.

123.    Denied.

124.    Denied.

## FOURTH CLAIM FOR RELIEF

### (Violation of NEPA and APA – Failure to Consider a Legitimate No Action Alternative)

125.    TVA incorporates its responses to the preceding paragraphs as if set forth in full.

126.    Denied.

127.    TVA admits that the referenced regulation provides that an Environmental Assessment should "[b]riefly provide sufficient evidence and analyses for determining whether to prepare an environmental impact statement or a finding of no significant impact," but denies that it addresses a "no action" baseline.  Except as expressly admitted, the allegations of paragraph 127 are denied.

128.    Answering the allegations of paragraph 128, TVA states NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  Except as expressly admitted, the allegations of paragraph 128 are denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied.

133.    Denied.

## FIFTH CLAIM FOR RELIEF

### (Violation of NEPA and APA – Failure to Examine Reasonable Alternatives to the Life Extension Project)

134.    TVA incorporates its responses to the preceding paragraphs as if set forth in full.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.    Denied.

## SIXTH CLAIM FOR RELIEF

### (Violation of NEPA and APA – Failure to Analyze Landfill Impacts)

140.    TVA incorporates its responses to the preceding paragraphs as if set forth in full.

141.    TVA admits that the quotations contained in paragraph 141 from the referenced regulatory provisions are accurate in part, but states that both provisions require only "brief" analyses, evidence, and discussions of alternatives.  Except as expressly admitted, the allegations of paragraph 141 are denied.

142.    TVA admits that the quotations contained in paragraph 142 from the referenced regulatory provisions are accurate in part, but states that the provisions expressly apply to Environmental Impact Statements.  Except as expressly admitted, the allegations of paragraph 142 are denied.

143.    Answering the allegations in paragraph 143, TVA states that coal combustion residue will be stored in the newly constructed North Rail Loop Landfill (NRL), and, in the event the NRL begins to approach full capacity, TVA would take steps to construct a South Rail Loop landfill after conducting additional hydrogeologic studies, developing a landfill design, obtaining a solid waste disposal permit, and conducting additional environmental reviews as appropriate. TVA denies that the Gallatin projects are a "Life Extension Project."  Except as expressly admitted, the allegations of paragraph 143 are denied.

144.    Denied.

145.    Denied.

146.    Denied.

147.     Denied.

## SEVENTH CLAIM FOR RELIEF

### (Violation of NEPA and APA – Failure to Allow for Public Comment)

148.     TVA incorporates its responses to the preceding paragraphs as if set forth in full.

149.     Denied.

150.     TVA admits that the statutory and regulatory language contained in paragraph 150 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.

151.     TVA admits that the statutory and regulatory language contained in paragraph 151 is accurately quoted in part and that NEPA and the regulations promulgated pursuant to NEPA speak for themselves.  TVA denies the allegations in the second sentence of paragraph 151.  Except as expressly admitted, the allegations of paragraph 151 are denied.

152.     Denied.

## ANSWER TO PRAYER FOR RELIEF

Defendant denies that Plaintiffs are entitled to the relief requested, or to any relief.

## AFFIRMATIVE DEFENSES

### First Defense

The actions taken by TVA and challenged herein were reasonable and consistent with and authorized by the TVA Act and applicable federal statutes and regulations and are reasonably related to the governmental functions carried out by TVA, and such actions were not arbitrary, capricious, or otherwise contrary to law.

### Second Defense

TVA states that although venue is appropriate in this district, this case should be transferred to the United States District Court for the Eastern District of Tennessee because the

Complaint involves issues that are intertwined with a Consent Decree entered by the Eastern District and over which it has continuing jurisdiction. (TVA's Motion to Transfer Venue, Docs. 17, 18.)

WHEREFORE, TVA prays that this action be dismissed as to it and that TVA recover its costs and such other relief, legal and equitable, to which it is entitled.

Respectfully submitted,

*s/Maria V. Gillen*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Tricia L. Roelofs, Attorney
Defendant GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.6225

Attorneys for Tennessee Valley Authority

3614122

## CERTIFICATE OF SERVICE

I certify that on June 24, 2013, the foregoing document was filed electronically through the Court's ECF system. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated below.

Delta Anne Davis, Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
adavis@selctn.org

Abigail M. Dillen, Esq.
Earthjustice
156 William Street, Suite 800
New York, New York 10038
adillen@earthjustice.org

Nathan Travis Moore , Esq.
Southern Environmental Law Center
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
nmoore@selctn.org

Craig H. Segall, Esq.
Sierra Club
50 F Street NW
8th Floor
Washington, DC 20001
craig.segall@sierraclub.org

John T. Suttles, Jr., Esq.
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, North Carolina 27516-2356
jsuttles@selcnc.org

Myra Dean Blake, Esq.
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, North Carolina 27516-2356
mblake@selcnc.org

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority