| | | |
|---|---|---|
| TENNESSEE ENVIRONMENTAL COUNCIL, TENNESSEE SCENIC RIVERS ASSOCIATION, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:13-cv-00374 |
| v. | ) ) | Chief Judge Thomas A. Varlan Magistrate Judge H. Bruce Guyton |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO TVA'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Nathan T. Moore, Staff Attorney
John Suttles, Senior Attorney
Delta Anne Davis, Managing Attorney
Myra Blake, Associate Attorney
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470

Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, and Sierra Club

Mary Whittle, Staff Attorney
EARTHJUSTICE
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA 19103
Telephone: (215) 717-4524
Bridget Lee, Associate Attorney
EARTHJUSTICE
156 William Street, Suite 800
New York, NY 10038
Telephone: (212) 845-7379
Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, Sierra Club, and Center for
Biological Diversity

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

GLOSSARY OF ACRONYMS............................................................................................. vi

PRELIMINARY STATEMENT ............................................................................................. 1

STANDARD OF REVIEW .................................................................................................... 6

ARGUMENT .......................................................................................................................... 6

I.     TVA Decided to Control and Continue Operating the Gallatin Plant and
       Committed Resources to the Project Before NEPA Review. ........................................7

       A.     TVA Executed Contracts for Final Design and Construction Before
              Completing the Requisite NEPA Review...........................................................7

       B.     The TVA Board Approved and TVA Staff Began Implementing the
              Project in 2011..................................................................................................10

       C.     TVA Violated NEPA by Making Its Decision to Undertake the Project
              Without Public Participation. ...........................................................................11

       D.     TVA Ordered TWRA to Dismantle the Aquatic Center Prior to NEPA
              Review. .............................................................................................................12

II.    TVA Used an Improper "No Action" Alternative. ......................................................14

III.   TVA Failed to Analyze a Single Reasonable Alternative to the Project. ....................16

IV.    TVA Improperly Refused to Analyze the South Rail Loop Landfill............................19

V.     TVA Excluded the Public from Its Decision to Continue Operating Gallatin. ............20

VI.    An EIS Is Required Because the Project Would Cause Significant Impacts to
       the Human Environment and Is Highly Controversial. ................................................21

CONCLUSION..................................................................................................................... 24

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page**

*Alabama v. TVA,* No. 3:11-cv-170 (E.D. Tenn. June 30, 2011) .................................................2, 12

*All Indian Pueblo Council v. United States*, 975 F.2d 1437 (10th Cir.
    1992) .................................................................................................................19

*American Rivers v. FERC*, 201 F.3d 1186 (9th Cir. 2000)......................................................15, 16

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87
    (1983).................................................................................................................10

*Beyond Nuclear v. U.S. Nuclear Regulatory Comm'n*, Nuclear Reg. Rep. P
    20,732 .................................................................................................................18

*Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835 (S.D.
    Ohio 2005) .................................................................................................................19

*Buck Mountain Cmty. Org. v. TVA*, 629 F. Supp. 2d 785 (M.D. Tenn.
    2009) .................................................................................................................18

*Bullwinkel v. U.S. Dep't of Energy,* 899 F. Supp. 2d 712 (W.D. Tenn.
    2012).................................................................................................................20

*Burkholder v. Peters*, 58 F. App'x 94 (6th Cir. 2003) .................................................................3, 9

*Burkholder v. Wykle*, 268 F. Supp. 2d 835 (N.D. Ohio 2002), *aff'd sub*
    *nom. Burkholder v. Peters*, 58 F. App'x 94 (6th Cir. 2003) .................................................9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................6

*City of Ridgeland v. Nat'l Park Serv.*, 253 F. Supp. 2d 888 (S.D. Miss.
    2002) .................................................................................................................15

*City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434 (6th Cir. 2005).....................................20

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538
    F.3d 1172 (9th Cir. 2008) .................................................................................................17

*Citizens Against Burlington v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) .....................................4, 17

*Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686 (3rd Cir. 1999)..................................18

*Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232 (W.D. Wash. 2009)..........................................16

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001) .........................................15

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ...................................................................17, 22

*Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273 (D. Del. 2011)...........................................18

*Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*,
    685 F.3d 259 (3rd Cir. 2012) .........................................................................................10

*Duck River Pres. Ass'n v. TVA*, 410 F. Supp. 758 (E.D. Tenn. 1974), *aff'd*,
    529 F.2d 524 (6th Cir. 1976) .........................................................................................12

*Envtl. Def. Fund v. TVA*, 371 F. Supp. 1004 (E.D. Tenn. 1973), *aff'd*, 492
    F.2d 466 (6th Cir. 1974) ...............................................................................................14

*Flaherty v. Bryson*, 850 F. Supp. 2d 38 (D.D.C. 2012) ...............................................................16

*Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692 (10th Cir.
    2005) .................................................................................................................................8

*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998).............................8, 15

*Hillsdale Envt'l Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 2011
    WL 2579799 (D. Kan. 2011) .........................................................................................19

*Hirt v. Richardson*, 127 F. Supp. 2d 833 (W.D. Mich. 1999) ...................................................6, 22

*In re TVA*, Docket No. CAA-04-2010-1760 (EPA Apr. 14, 2011) .................................................2

*In re TVA Ash Spill Litig.*, 805 F. Supp. 2d 468 (E.D. Tenn. 2011) ...........................................6

*Kilroy v. Ruckelshaus*, 738 F.2d 1448 (9th Cir. 1984) .................................................................16

*Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990)..........................................................................8

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ...........................................................6

*Miccosukee Tribe of Fla. v. United States*, 509 F. Supp. 2d 1288 (S.D.
    Fla. 2007) .......................................................................................................................15

*Moore v. Philip Morris Cos.*, 8 F.3d 335 (6th Cir.1993)..............................................................6

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir.
    1999) ...............................................................................................................................17

*Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005)......................................7, 11

*Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:11-cv-171 (E.D. Tenn. June 30, 2011) ...........................................................................................2, 12

*Nw. Envt'l Defense Ctr. v. Rumsfeld*, No. Civ. 01-1489-HO, 2002 WL 1906883 (D. Ore. June 21, 2002) .......................................................8

*Northwoods Wilderness Recovery, Inc. v. U.S. Forest Serv.*, 323 F.3d 405 (6th Cir. 2003)...........................................................................................21

*Ocoee River Council v. TVA*, 540 F. Supp. 788 (E.D. Tenn. 1981) ................................6

*Pub. Serv. Co. of Colo. v. Andrus*, 825 F. Supp. 1483 (D. Idaho 1993) .......................22

*Pure Waters v. Mich. Dep't of Natural Res.,* 883 F. Supp. 199 (E.D. Mich. 1995) ...........................................................................................23, 24

*R.I. Comm. on Energy v. Gen. Servs. Admin.*, 397 F. Supp. 41 (D.R.I. 1975) ...............................................................................................9

*San Juan Citizens' Alliance v. Salazar*, No. 00–cv–00379–REB–CBS, 2009 WL 824410 (D. Colo. Mar. 30, 2009) .......................................15

*Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334 (6th Cir. 2006) ...............................................................................................18

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988)........................................8

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) ...........................................................21, 22

*Steamboaters v. FERC*, 759 F.2d 1382 (9th Cir. 1985)................................................22

*Stop H-3 Ass'n v. Volpe*, 349 F. Supp. 1047, *amended by* 353 F. Supp. 14 (D. Haw. 1972) .............................................................................9

*Town of Fairview v. Dep't of Transp.*, 201 F. Supp. 2d 64 (D.D.C. 2002) ....................8

*W. N.C. Alliance v. N.C. Dep't of Transp.*, 312 F. Supp. 2d 765 (E.D.N.C. 2003) ...........................................................................................20

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .....................................10

iv

**Statutes**

Administrative Procedure Act ("APA")

5 U.S.C. § 706(2)(A)..................................................................................6
5 U.S.C. § 706(2)(D)..................................................................................6

National Environmental Policy Act ("NEPA")

42 U.S.C. § 4332(2)(E)............................................................................17

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(c) .................................................................................6

**Federal Regulations**

40 C.F.R. § 1500.2(d) ..............................................................................20
40 C.F.R. § 1502.5...................................................................................11
40 C.F.R. § 1506.1(a)...............................................................................14
40 C.F.R. § 1506.1(a)(2)...................................................................3, 9, 10
40 C.F.R. § 1508.9(b) ..............................................................................17
40 C.F.R. § 1508.25(a)(1)-(3)...................................................................20
40 C.F.R. § 1508.27(b)(7).........................................................................20

**Other Authorities**

Forty Most Asked Questions Concerning the Council on Environmental
Quality's NEPA Regulations, 46 Fed. Reg. 18,026 (Mar. 23, 1981) ................................14, 15, 17

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| **ACI** | activated carbon injection |
| **APA** | Administrative Procedure Act |
| **CEQ** | Council on Environmental Quality |
| **CRAC** | Cumberland River Aquatic Center |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **EPA** | U.S. Environmental Protection Agency |
| **FFCA** | Federal Facilities Compliance Agreement |
| **FGD** | flue gas desulfurization |
| **FONSI** | Finding of No Significant Impact |
| **GAF** | Gallatin Fossil Plant |
| **IRP** | Integrated Resource Plan |
| **NEPA** | National Environmental Policy Act |
| **SRL** | South Rail Loop (Landfill) |
| **TWRA** | Tennessee Wildlife Resources Agency |
| **USFWS** | U.S. Fish and Wildlife Service |
| **WMA** | Gallatin Steam Plant Wildlife Management Area |

## PRELIMINARY STATEMENT

The Tennessee Valley Authority ("TVA") asks this Court to condone its violations of the National Environmental Policy Act ("NEPA") and attempts to support its request by mischaracterizing the nature of Plaintiffs' claims, omitting or misstating key facts, and misapplying law. In reality, the administrative record warrants rejection of TVA's motion for judgment on the administrative record, and instead demonstrates Plaintiffs' entitlement to judgment on the record in their favor.

TVA mischaracterizes the nature of Plaintiffs' NEPA challenge, arguing that Plaintiffs want to use NEPA to "force [TVA] to adopt [their] preferred option." Doc. 47 at 4. To the contrary, while Plaintiffs believe there are more cost-effective, protective, and prudent alternatives to TVA's $1.2-billion project to construct air-pollution controls and continue operating the 54-year-old Gallatin coal units (the "Project")[1], that is not the legal or factual basis for this NEPA challenge. Instead, Plaintiffs request only that TVA comply with NEPA's basic requirements by taking a "hard look" at the environmental impacts of its decision, comparing those impacts to a range of reasonable alternatives, and engaging the public at an early enough stage to influence the decision-making process. TVA's violations of NEPA are especially important in this case, as TVA concluded that "it is a close question whether to proceed with the projects." AR 537. Had TVA properly considered the full environmental consequences of its decision, evaluated alternatives, and allowed for timely public participation, TVA may have resolved this "close question" differently.

---

[1] In addition to the four coal-fired units at issue in this case, the Gallatin facility comprises eight natural-gas-fired combustion turbines. This case focuses on the four coal-fired units, which are referred to as the "Gallatin Plant."

TVA also mischaracterizes key facts in its motion. TVA argues that a June 2011 fleet-wide consent decree[2] settling TVA's alleged Clean Air Act violations vitiates TVA's NEPA obligations and excuses its decision to retrofit and continue operating the Gallatin coal units without public input or considering the environment. Doc. 47 at 3. TVA based this decision on internal analyses, prepared in November 2010 and April 2011, which ranked coal units within TVA's fleet for continued operation based on operating characteristics and costs, regulatory compliance costs, fuel flexibility, and anticipated future capital requirements. *See* AR 19035–58; 19059–80. These internal studies did not evaluate the environmental impacts of TVA's decision or compare those impacts to the impacts of reasonable alternatives under the Consent Decree: repowering with renewable biomass or retirement. *Id*. TVA did not disclose the existence of these studies to the public until it filed the administrative record in this case, nearly six months after TVA issued its final Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the Project. *See* Doc. 43. TVA feigns surprise at this challenge, mistakenly arguing that Sierra Club is changing its position on the merits of the Consent Decree. Doc. 47 at 3. But TVA cannot possibly be surprised that Plaintiffs, including the Sierra Club, expect TVA to comply with its NEPA obligations, as the Consent Decree does not purport to—and legally could not—sanction TVA's failure to comply with NEPA. Consent Decree at ¶ 203 (providing that "nothing in this Consent Decree shall relieve TVA of its obligation to comply with all applicable federal, state, and/or local laws," including NEPA); *see also* AR 5643.

---

[2] In June 2011, TVA entered into two substantively identical settlement agreements to resolve three related Clean Air Act enforcement actions filed by EPA, four states, and three non-profit environmental organizations, including Sierra Club. Federal Facilities Compliance Agreement ("FFCA"), *In re TVA*, Docket No. CAA-04-2010-1760 (EPA Apr. 14, 2011) (resolving enforcement action filed by EPA); Consent Decree, entered in *Alabama v. TVA*, No. 3:11-cv-170, and *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:11-cv-171 (E.D. Tenn. June 30, 2011) (resolving enforcement actions filed by states and non-profit organizations). Hereinafter, the FFCA and Consent Decree are collectively referred to as "Clean Air Act Settlements."

TVA also ignores Sixth Circuit case law and omits critical facts to argue that it did not predetermine the outcome of the Gallatin NEPA process or prematurely commit resources to the Project. Doc. 47 at 12–17. Before completing the NEPA process, which merely compared the impacts of placing equipment at two similar locations, TVA already had decided to retrofit and continue operating the Gallatin coal units, secured over $1 billion to fund the project, ordered the dismantling and relocation of the highly successful Cumberland River Aquatic Center ("Aquatic Center"), issued work orders and executed contracts to design and construct the Project at a cost of more than $674 million, and incurred nearly $45 million in irreversible charges for final engineering, materials procurement, and construction work. AR 1, 43–44, 14159, 14600, 14642, 14647, 14652, 14667, 14674, 14682, 14691, 14699, 14710, 14722, 15043, 15059, 16616, 16633, 16639, 16645, and 18993. TVA tries to characterize this as "preliminary" work that "had no impact on the environment," and claims that because the pre-NEPA contracts postponed major on-site construction until completion of environmental reviews and included routine termination-at-will clauses, they did not constitute impermissible commitments. Doc. 47 at 13–14.

TVA is wrong. The Sixth Circuit has made clear that contracts and financing for final design work prior to completion of the NEPA process are impermissible because they preclude proper consideration of reasonable alternatives. *Burkholder v. Peters*, 58 F. App'x 94, 97 (6th Cir. 2003) ("[A] contract for final design work . . . clearly violate[s]" Council on Environmental Quality ("CEQ") regulations prohibiting "any action that would 'limit the choice of reasonable alternatives.'") (citing 40 C.F.R. § 1506.1(a)(2)). While the construction contracts limited "major construction activities at the Site" until completion of the NEPA process, they simultaneously directed the contractors to prefabricate and pre-assemble project elements offsite "to the maximum extent practical to reduce field erection time." *See* AR 14731, 14818. This is

not a case where TVA merely engaged in studies before completing the NEPA process: TVA decided what it wanted to do and went to great lengths and expense to implement that decision before initiating and completing the public NEPA process.

TVA also attempts to validate the NEPA process that it ultimately conducted. To minimize the relative significance of the Project's impacts, TVA compared them to the impacts of an unlawful "no action" baseline that assumes continued operation of the Gallatin coal units indefinitely without the controls required in the Clean Air Act Settlements. In fact, if TVA did not install the controls, the units would have to be shut down, and the Project should have been compared to the real baseline—retirement by 2017. TVA even acknowledged that its "[no-action] alternative is not considered viable or reasonable." AR 253. Even compared to TVA's meaningless "no action" baseline, the impacts of continued operation of the plant disclosed in TVA's flawed EA—including the generation of two to five times more coal-combustion waste, the construction of two massive new landfills to hold that waste, the dismantling and disruption of one of the most successful endangered mussel propagation centers in the country, and the release for decades to come of millions of tons of air pollution and the discharge of billions of gallons of wastewater annually—are significant. AR 262, 335, 356, 340; AR Supp. 43.

TVA also failed to give meaningful consideration to a single alternative to the Project. TVA interpreted its project purpose of creating "a more balanced portfolio of energy resources on the TVA power system" so narrowly as to permit only continued operation of the Gallatin coal units. AR 241, 272. This interpretation violates NEPA. An agency's purpose and need statement cannot be "so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.).

In addition, TVA refused to consider the impacts of the South Rail Loop Landfill, claiming that aspect of the Project is too speculative. Yet the record is clear that TVA must construct two new landfills to accommodate the coal-combustion waste generated over the 20-year planned life of the Project. AR 370. The North Rail Loop Landfill will reach its capacity in a maximum of 15 years, at which point TVA will need to utilize the South Rail Loop Landfill for coal-ash disposal. AR 262.

TVA contends that it was not required to involve the public in its decision to spend $1.2 billion to prolong operation of a massive source of coal-combustion waste and air and water pollution. At the same time, TVA claims that it provided more than sufficient opportunity for public input on the narrower question of where to site its already-decided-upon control equipment—on one side of the discharge channel or the other. Doc 47 at 21. TVA's position contradicts NEPA's fundamental purpose to foster excellent decision-making by requiring agencies to engage the public at the earliest possible opportunity. TVA made the critical decision to retrofit and continue operating the Gallatin coal units without public participation and before commencing the NEPA process. AR 19035–58, 19059–80. TVA's attempt to refer back (or "tier") to its 2011 Integrated Resource Plan ("IRP") and associated Environmental Impact Statement ("EIS") does not suffice, since these documents do not purport to provide any Gallatin-specific analysis. AR 241, 554–55, 995.

Finally, TVA contends that it was not required to complete an EIS in this case because it deemed the Project's effects insignificant when compared to operating the coal units unlawfully without air-pollution controls beyond 2017, and that this Court must defer to TVA's interpretation of the facts. TVA again errs. "[A] court must look beyond the conclusory statements in an EA and examine whether the agency has provided a 'convincing statement of

reasons why potential effects are insignificant.'" *Hirt v. Richardson*, 127 F. Supp. 2d 833, 839

(W.D. Mich. 1999) (internal citations omitted). Even compared to TVA's illegal "no action"

baseline, the impacts disclosed in TVA's flawed EA are significant, and they are even more

significant when evaluated against the legal and proper "no action" baseline of ceasing

operations after 2017. For these reasons, Plaintiffs respectfully request that this Court deny

TVA's motion for judgment on the administrative record.

## STANDARD OF REVIEW

NEPA actions are subject to judicial review under the Administrative Procedure Act

("APA"). *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375–77 (1989). The APA instructs

reviewing courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of

procedure required by law." 5 U.S.C. § 706(2)(A), (D). The arbitrary and capricious standard

requires a "careful and searching inquiry" by the reviewing court, rather than an automatic

"rubber stamp" of an agency decision. *Ocoee River Council v. TVA*, 540 F. Supp. 788, 795 (E.D.

Tenn. 1981).

Summary judgment is appropriate where there are no genuine issues of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving

party bears the burden of establishing that no genuine issues of material fact exist. *In re TVA

Ash Spill Litig.*, 805 F. Supp. 2d 468, 474 (E.D. Tenn. 2011) (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)).

## ARGUMENT

TVA claims that Plaintiffs are attempting to use NEPA to shut down the Gallatin Plant.

Instead, Plaintiffs contend that TVA failed to consider and disclose the environmental impacts of

its decision to continue operating the Gallatin Plant or to consider a meaningful range of

alternative projects, including repowering or retiring the plant, which were identified as reasonable compliance alternatives under the Clean Air Act Settlements. TVA covertly decided to retrofit and continue operating the plant based on undisclosed studies that considered business metrics, not environmental concerns, and then attempted to justify its decision with an EA skewed to avoid any real analysis. For these reasons, TVA's motion should be denied.

I.    **TVA Decided to Control and Continue Operating the Gallatin Plant and Committed Resources to the Project Before NEPA Review.**

A.    **TVA Executed Contracts for Final Design and Construction Before Completing the Requisite NEPA Review.**

TVA admits that it executed numerous contracts implementing the Project prior to engaging in the NEPA process, but suggests that it limited such contracts to the type of preliminary engineering studies and cost estimates that have been permitted in certain cases. Doc. 47 at 13–14. TVA further argues that its execution of contracts totaling $450 million and expenditure of more than $12 million prior to even *beginning* the NEPA process is not evidence that it had already chosen the Project, because those contracts included standard "termination for convenience" clauses. *Id.* at 14–15.

The record makes clear that TVA's *pre*-NEPA contracts authorized and directed final design, material procurement, and construction work that far exceeded permissible project pre-planning, which is limited to "the most minor of steps toward a course of action that an agency initially prefers." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 205 (4th Cir. 2005); AR 14642–710, 14722, 15059, 16633. While an agency is not necessarily prohibited from undertaking preliminary studies to evaluate project possibilities, "[t]he proper inquiry in a NEPA case is . . . not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has '[l]imit[ed] the choice of reasonable alternatives." *Id.* at 206. While truly preliminary work such as "environmental

studies and land surveys" may not cross the line, courts have found "an irreversible and irretrievable commitment [of resources] was present when construction contracts were awarded prior to the completion of the EAs." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 715 (10th Cir. 2005) (citing *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717–19 (9th Cir. 1988)).

Here, TVA began implementing its decision to control and continue operating the Gallatin coal units and made irretrievable commitments of federal funds to the Project soon after the Board approved it and before commencing the NEPA process. Within six weeks of the Board's approval, TVA issued project authorizations for engineering and design work for the Project. AR 14652, 14667, 14674, 14682. TVA spent more than $12 million for work— including authorizations for permanent material purchases, equipment purchases, and construction management support—before issuing the Draft EA. AR 14139, 14578. Before completing the NEPA process, TVA issued additional project authorizations, and executed contracts with construction firms for the design and installation of the air pollution controls and by-product handling systems. AR 14710, 14722, 15059, 16633. By the time TVA issued the Final EA and FONSI, it had authorized close to $674 million for the work and had incurred more than $45 million in actual charges. *Id.*; AR 14159, 14600, 14642, 14699, 15043, 16616, 18993.

TVA cites to non-binding cases from other jurisdictions[3] to support its argument that these expenditures did not predetermine its decision, and ignores governing Sixth Circuit

---

[3] These cases do not apply because they involved activities such as: research, captive breeding, and contacting landowners, *Forest Guardians*, 611 F.3d at 719; studies to determine "what projects—if any—are to be developed," *Macht v. Skinner*, 916 F.2d 13, 16 (D.C. Cir. 1990); preliminary planning activities, *Town of Fairview v. Dep't of Transp.*, 201 F. Supp. 2d 64, 77 n. 13 (D.D.C. 2002); preliminary studies, *Nw. Env't Defense Ctr. v. Rumsfeld*, No. Civ. 01-1489-HO, 2002 WL 1906883, at *6–7 (D. Ore. June 21, 2002); and a tentative operating schedule, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998). Unlike those cases, TVA had already determined that it wanted to retrofit and continue operating Gallatin, and the resources it committed and the contracts into which it entered served to implement this decision, rather than to further the evaluation of its impacts or compare it to other alternatives.

precedent explaining that "a contract for final design work . . . before completion of the EA and the FONSI . . . clearly violate[s] CEQ . . . regulations prohibiting . . . any action that would 'limit the choice of reasonable alternatives.'" *Burkholder v. Peters*, 58 F. App'x at 97 (citing 40 C.F.R. § 1506.1(a)(2)).[4] Other courts have distinguished design work necessary for an agency to complete its NEPA analysis, which is permissible, from design work that advances the agency's preferred project, which is not. *See Stop H-3 Ass'n v. Volpe*, 349 F. Supp. 1047, 1048–49 *amended by* 353 F. Supp. 14 (D. Haw. 1972) (holding that the latter was not permissible before completion of an EIS). The construction contracts and expenditure of $45 million demonstrated TVA's commitment to the Project and prejudiced TVA's NEPA analysis, as evidenced by TVA's failure to consider any other alternatives in its EA.

TVA claims that the project authorizations had no impact on the environment because they provided: "[n]o physical *onsite* construction can start until the project Phase 3 . . . is approved and required environmental approvals are obtained." Doc. 47 at 14; *see, e.g.*, AR 14642, 14699 (emphasis added). But TVA fails to tell the Court that while the construction contracts limited "major construction activities *at the Site*" until completion of the NEPA process, they also directed the contractors to prefabricate and pre-assemble project elements *offsite* "to the maximum extent practical to reduce field erection time." *See* AR 14731, 14818 (emphasis added). TVA also ignores case law holding that "there is no rational basis to support [an agency's] conclusion that it need not prepare and file an EIS prior to executing a conditional sales contract" that is contingent on obtaining the necessary environmental clearances. *R.I. Comm. on Energy v. Gen. Servs. Admin.*, 397 F. Supp. 41, 61 (D.R.I. 1975). Taken to its logical

---

[4] The court ultimately held that no impermissible commitments had been made because, although a state agency had entered into contracts and financed design work, "no *federal* funds or obligations were committed to the project until after the FONSI's issuance." *Burkholder v. Wykle*, 268 F. Supp. 2d 835, 845 (N.D. Ohio 2002), *aff'd sub nom. Burkholder v. Peters*, 58 F. App'x 94 (6th Cir. 2003) (emphasis in original).

conclusion, TVA's position would lead to an absurd result, allowing completion of a project before a final NEPA determination, so long as the work was authorized by a contract that included an environmental review provision and an escape clause.

Furthermore, TVA fails to acknowledge relevant Supreme Court precedent, which states that when a decision "is made without the informed environmental consideration that NEPA requires, much of the harm that NEPA seeks to prevent has already taken place." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 35 (2008) (internal citations omitted*)*; *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 100 (1983). Finally, TVA ignores the second prong of the CEQ prohibition, 40 C.F.R. § 1506.1(a)(2), which precludes not only activities that would negatively affect the environment, but also those that would limit the choice of reasonable alternatives.

### B. The TVA Board Approved and TVA Staff Began Implementing the Project in 2011.

TVA cites *Delaware Department of Natural Resources and Environmental Control v. U.S. Army Corps of Engineers*, 685 F.3d 259 (3rd Cir. 2012), for the proposition that the inclusion of a "NEPA-contingent" clause in the TVA Board's 2011 resolution approving the Project "negate[s] any finding that an agency 'preselected' the result or foreclosed other alternatives." Doc. 47 at 15. However, the Third Circuit declared no such rule. In that case, the court simply concluded that entering a single construction contract with NEPA-contingency language, after more than 18 years of consistent public involvement on a project's EIS and supplemental environmental reviews, did not render the agency's NEPA analysis "a sham review." *Del. Dep't of Natural Res. & Envtl. Control*, 685 F.3d at 275 n.16. Here, TVA staff ignored the Board's directive to delay project implementation until after completion of the NEPA review and, instead, began implementing the Project by executing construction contracts

and expending significant sums of federal funds before commencing, much less completing, the

NEPA process. In evaluating compliance with NEPA, courts "must take a holistic view of what

the agency has done to assess environmental impact." *Nat'l Audubon Soc'y*, 422 F.3d at 186. A

holistic view of the record in this case shows that TVA decided to undertake the Project,

executed contracts and began work to implement its decision, and only then engaged in a sham

NEPA review engineered to rationalize and support that predetermined outcome. *See* 40 C.F.R.

§ 1502.5 (NEPA review must "not be used to rationalize or justify decisions already made").

> **C.     TVA Violated NEPA by Making Its Decision to Undertake the Project Without Public Participation.**

TVA based its decision to retrofit and to continue operating the Gallatin coal units on its

November 2010 "Coal Unit Group Ranking 2010 Update" and its April 2011 "Fossil Fleet

Strategy Analysis: Final Recommendations." AR 19039–43, 19046, 19049, 19064–66; *see* AR

272. TVA contends that these analyses were not conducted outside the NEPA process because:

(1) Plaintiff Sierra Club was privy to the analyses through its involvement in the IRP Stakeholder

Review Group; (2) Sierra Club referenced the analyses in the joint motion to enter the Clean Air

Act Settlement Agreements; (3) the analyses were summarized in the Final EA for the Project;

and (4) redacted versions of the analyses appear in the record. Doc. 47 at 15–16.

Contrary to TVA's unsupported assertions, TVA did not provide the IRP Stakeholder

Review Group with its Coal Unit Group Rankings or its Fossil Fleet Strategy Analysis and Final

Recommendations. TVA points to no support for its bald assertion, because it cannot. In fact,

these documents were not made available to the public until they were included in the

administrative record in this case—nearly six months *after* TVA issued the Final EA and

FONSI.[5]  Similarly, the joint motion to resolve TVA's alleged Clean Air Act violations does not mention these private analyses, because TVA did not disclose them as part of that settlement. *See* Joint Motion to Enter Consent Decree, *Alabama v. TVA*, No. 3:11-cv-170, *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:11-cv-171, Doc. 19 at 15–16 (E.D. Tenn. June 16, 2011).

Finally, TVA provided conclusory statements—rather than summaries of the analyses—in the EA.  Such unsubstantiated assertions cannot support an agency's decision.  *See Duck River Pres. Ass'n v. TVA*, 410 F. Supp. 758, 764 (E.D. Tenn. 1974), *aff'd*, 529 F.2d 524 (6th Cir. 1976) (rejecting TVA's explanation of project impacts in an EIS as "conclusory" and not "sufficiently detailed").  Moreover, the inclusion of redacted information in a *post*-NEPA administrative record does not excuse the agency's failure to make the information on which its decision rests available to the public *during* the NEPA process.  The record clearly shows that TVA conducted these analyses behind closed doors, outside the NEPA process, and violated NEPA's fundamental requirement to engage the public as early as practicable *before* a decision is made.

## D. TVA Ordered TWRA to Dismantle the Aquatic Center Prior to NEPA Review.

Contrary to its litigation position, TVA instructed the Tennessee Wildlife Resources Agency ("TWRA") to dismantle the Aquatic Center prior to commencing the NEPA process. *See* Doc. 47 at 16.  TVA admitted that "TWRA was notified on *June 4, 2012* that TVA's [sic] plans to install additional emission control equipment at GAF [Gallatin] and that the additional controls equipment *would result* in land use conflicts with the CRAC."  (AR Supp. 49 (emphases added)).  The record is clear that while the Draft EA was out for public review and comment,

---

[5]TVA alleges the Southern Environmental Law Center's comments requesting that TVA disclose any internal analyses and contracts excuse TVA's award of contracts to implement the Project prior to completing the NEPA process.  Rather than condoning TVA's *extra*-NEPA decision to undertake the Project, the numerous public comments urging TVA to disclose any private analyses it had conducted demonstrate how obvious TVA's predetermination had become even at the Draft EA stage.

"TWRA [was] in the process of dismantling and closing the Cumberland River Aquatic Center (CRAC) at TVA/Gallatin *solely because we have been instructed to do so by TVA*. . . . We are instructed by TVA to have closed, dismantled, and removed the CRAC operation no later than March 30, 2013." AR Supp. 43 (emphasis added). On November 16, 2012, the Executive Director of TWRA informed the U.S. Fish and Wildlife Service ("USFWS"), "I was notified by the TVA that it was necessary to install scrubbers at their Gallatin Plant and that the only realistic site identified by the engineers was the area on which the CRAC was located. Therefore, the hatchery would have to be dismantled." AR Supp. 44. By then, the Aquatic Center had been largely dismantled, and TWRA was forced to stop taking in new juvenile mussels; to release endangered mussels into the environment ahead of schedule; and to delay projects to propagate or rear additional endangered mussels—all before completion of the NEPA process. AR Supp. 45.

The USFWS submitted formal comments on the Draft EA highlighting the impropriety of TVA's NEPA process to date, noting, "Although the closure of CRAC would not occur but for TVA's action, the Draft EA fails to evaluate the effects of this closure. Rather, TVA appears to accept no responsibility for the effects, repeatedly trying to deflect those effects to TWRA. . . . Without fully assessing the impact of the CRAC facility closure necessitated by the TVA proposed action, it is not possible to determine the relative impacts of each alternative, which does not seem to be in keeping with the intent of NEPA." AR Supp. 52–53.

Under considerable pressure, TVA eventually agreed to relocate the Aquatic Center. Nevertheless, based on its 2011 decision to proceed with the Project, TVA made numerous irreversible and irretrievable commitments of resources to implement that decision.[6] These

---

[6] To make room for the Project's landfills, TVA also cut the size of the Gallatin Steam Plant Wildlife Management Area ("WMA") from 1,500 to 229 acres, before undertaking the required NEPA analysis. AR 300.

commitments adversely affected the environment and limited the alternatives that TVA

considered.  *See* 40 C.F.R. § 1506.1(a).

## II.    TVA Used an Improper "No Action" Alternative.

In an attempt to downplay the significance of its decision to continue operating the

Gallatin coal units, TVA compared the environmental effects of the Project to a "no action"

alternative that is unlawful, improperly assumes the Gallatin Plant will continue operating, and is

"not considered viable or reasonable."  AR 253.  Specifically, TVA's "no action" baseline

assumes TVA would continue to operate the units indefinitely without the pollution controls

required by the Clean Air Act Settlements.  *Id.*  In an effort to justify this meaningless baseline,

TVA pays lip service to applicable CEQ guidance and mistakenly relies on cases that do not

support its position.

To determine whether a *proposed project* would have significant environmental impacts,

TVA must compare "the impact of the project" with "the impact absent the project."  *Envtl. Def.*

*Fund v. TVA*, 371 F. Supp. 1004, 1012 (E.D. Tenn. 1973), *aff'd*, 492 F.2d 466 (6th Cir. 1974);

*see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 17, 1981) (for federal decisions on project

proposals, "no action" means "the proposed activity would not take place, and the resulting

environmental effects from taking no action would be compared with the effects of permitting

the proposed activity or an alternative activity to go forward").  The Clean Air Act Settlements

provide the answer to this question:  if the Project does not occur, TVA cannot continue to

operate the Gallatin coal units beyond 2017.[7]  AR 5582–83, 5590–91; Consent Decree ¶¶ 69, 85,

No. 3:11-cv-170, Doc. 15.  Therefore, TVA's selection of a "no action" alternative that assumes

---

[7] Notably, in its motion, TVA ignores the Clean Air Act Settlements to argue that its preferred no-action baseline is
appropriate, even though it would violate the federal Mercury and Air Toxics Standards.  Doc. 47 at 18.

the continued operation of the Gallatin Plant "in its current state without . . . the proposed

emissions controls," Doc. 47 at 17, does not represent the status quo and is impermissible under

NEPA.

Rather than identifying an appropriate "no action" alternative to compare proposals for

new projects, the cases cited by TVA address a second scenario described in CEQ guidance that

is inapplicable to the case at hand—*i.e.,* a situation where an existing management plan (such as

a land or fisheries management plan) requires periodic updating.  *See* Forty Most Asked

Questions, 46 Fed. Reg. at 18,027.  CEQ explains that, in those situations, the proper "no action"

alternative is "'no change' from current management direction."  *Id.*  TVA's management

direction was codified in the Clean Air Act Settlements:  the Gallatin coal units cannot continue

operating without air pollution controls beyond 2017.  Thus, even under this approach, the

management direction and proper "no action" baseline is cessation of operations by 2017.

Instead of excusing TVA's reliance on an illegal baseline, the cases TVA cites show that

the proper baseline is the *known* effects of continuing the existing management direction—*i.e.*,

the plant would not generate additional air, water, or coal waste pollution beyond 2017.  TVA's

reliance on *American Rivers v. Federal Energy Regulatory Commission* (and other non-Sixth

Circuit cases[8]) is misplaced.  201 F.3d 1186 (9th Cir. 2000).  *American Rivers* does not stand for

the proposition that an agency may rely on an illegal baseline as opposed to a legal baseline with

---

[8] *See City of Ridgeland v. Nat'l Park Serv.*, 253 F. Supp. 2d 888, 901–03 (S.D. Miss. 2002) (holding that the "no action" alternative for a *supplemental* EIS appropriately relied on current conditions rather than conditions prior to the first EIS, because "[i]f the proposal is to modify a plan, the impacts are the impacts of the unmodified plan."); *San Juan Citizens' Alliance v. Salazar*, No. 00–cv–0379–REB–CBS, 2009 WL 824410, at *17 (D. Colo. Mar. 30, 2009) (permitting use of a no-action alternative that represented continuation of present management direction adopted in a prior EA because "[t]he purpose of a 'no action' alternative is to allow agencies to 'compare the potential impacts of the proposed major federal action to the *known* impacts of maintaining the status quo.'" (emphasis added) (citing *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001), *accord Miccosukee Tribe of Florida v. United States*, 509 F. Supp. 2d 1288, 1293 (S.D. Fla. 2007) (quoting *Custer*); and *Friends of Southeast's Future*, 153 F.3d at 1067 (holding that an agency may use a no-action alternative that does not meet the project's purpose and need—as opposed to an illegal no-action alternative—where the agency had considered a suite of five meaningful alternatives).

known consequences. Instead, the court in *American Rivers* permitted an agency to use the *known* impacts of an existing hydroelectric operating license as the proper baseline where the terms and resulting effects of a required but unissued permit renewal were completely speculative. *Id.* at 1195–99. Furthermore, in *American Rivers* the substantive statute at issue— the Federal Power Act—provides for the possibility of continued operations pursuant to the terms of an expired license during the pendency of relicensing proceedings. *Id.* at 1200. The court therefore agreed that continued operations "simply reflects th[e] statutory reality." *Id.*

Here, continued operation of the Gallatin coal units without controls beyond 2017 does not reflect the legal reality of the Clean Air Act Settlements. TVA's use of this unlawful baseline to evaluate the environmental impacts of the Project was therefore a meaningless exercise that violates NEPA. *See Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir. 1984) (continuation of an existing disposal method beyond a permit renewal date would have violated a consent decree and recent legislation, and therefore was not an "appropriate and reasonable benchmark"); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 72–73 (D.D.C. 2012) ("As the EA itself admits, the 'no action' alternative is in fact no alternative at all," since "taking no action would result in a plain violation of the [relevant statutory] requirements"); *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1246 (W.D. Wash. 2009) ("Agencies were required to account for [a court order] in crafting their no-action alternative; failing to do so violated NEPA.").

## III. TVA Failed to Analyze a Single Reasonable Alternative to the Project.

TVA contends that it was not required to consider in detail any alternatives—other than the same Project in two adjacent locations—because TVA had already concluded that its goal of "[a]chieving and maintaining a more balanced portfolio of energy resources on the TVA power system" can only be met by continuing to operate the Gallatin coal units, and that to do so requires construction of the Project. Doc. 47 at 19. TVA's failure to analyze any reasonable

alternatives to the Project violates NEPA. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (holding that an agency "failed to consider adequate alternatives" when it evaluated a "no action alternative along with two virtually identical alternatives").

TVA acknowledges that an agency may not define the objectives of its action in terms "so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action." *See* Doc. 47 at 19 (citing *Citizens Against Burlington*, 938 F.2d at 196); *see also Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002) (although agencies can "reject alternatives that [do] not meet the purpose and need of the project," they cannot "define the project so narrowly that it foreclose[s] a reasonable consideration of alternatives"). But TVA has done just that, by construing one project purpose so narrowly as to exclude meaningful consideration of any alternative other than retrofitting and continuing to operate the Gallatin coal units.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action," 42 U.S.C. § 4332(2)(E), and evaluate "a reasonable number of examples covering the full spectrum of alternatives." Forty Most Asked Questions, 46 Fed. Reg. at 18,027 (discussing the "range of alternatives" for consideration under NEPA). An EA must include a discussion of alternatives and "the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). And an agency must give alternatives "full and meaningful consideration, whether the agency prepares an EA or an EIS." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (internal quotation marks and citations omitted). Here, although the Clean Air Act Settlements specified that repowering and retiring the Gallatin coal units were reasonable alternatives, TVA summarily

rejected these options because of the non-public analyses on which it had already based its decision to retrofit and continue operating the units. AR 272–74. Despite its admission that retirement and generation replacement "would comply with the FFCA and applicable regulations and would further reduce emissions from the plant," TVA violated NEPA by refusing to evaluate in any detail a retirement alternative (or any other alternative).

The cases cited by TVA do not support the notion that an agency can so narrowly circumscribe its project purpose that only one outcome—its preferred project—can meet it, nor that it can summarily dismiss reasonable alternatives that would otherwise meet a neutrally defined project purpose. In *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 345 (6th Cir. 2006), the Sixth Circuit explained that courts should be suspicious of "agency solipsism" and other efforts to "contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)" (internal citations omitted)). There, the court approved the adequacy of an agency's alternative consideration only because plaintiffs "[had] not identified a single alternative that the agency should have considered but did not." *Id.* at 347.[9]

Other cases cited by TVA simply affirm the logical conclusion that where an agency gives detailed consideration to a broad range of reasonable alternatives in an EIS, it may dismiss unreasonable alternatives. *See Buck Mountain Cmty. Org. v. TVA*, 629 F. Supp. 2d 785, 798–99 (M.D. Tenn. 2009) (upholding TVA's alternatives analysis where the EA provided an "extensive description" of the process used to evaluate 17 different alternative transmission line routes, and that process included evaluation of environmental criteria); *Beyond Nuclear v. U.S. Nuclear*

---

[9] Other authority cited by TVA similarly refused to set aside an EIS for failure to consider additional alternatives because plaintiffs failed to identify any alternative that the agency failed to consider, *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 283-83 (D. Del. 2011), or where plaintiffs had not offered "any specific, detailed counterproposal that had a chance of success," *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 706 (3rd Cir. 1999) (citations omitted). Neither situation is the case here.

*Regulatory Comm'n,* 704 F.3d 12, 16 (1st Cir. 2013) (accepting an agency's rejection of wind power as a viable alternative, where the environmental report addressed four reasonable alternatives to a nuclear license renewal: "natural gas-fired generation; coal-fired generation; a new nuclear plant; and power purchases"); *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) ("It is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and *possible alternatives*, a requirement that we have characterized as 'the linchpin of the entire impact statement'" (emphasis added) (citation omitted)); *Buckeye Forest Council v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 845–47 (S.D. Ohio 2005) (upholding the sufficiency of an agency's alternative analysis where it considered three distinct alternatives, including a true no-action alternative); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 2011 WL 2579799, at *5-6 (D. Kan. 2011) (upholding the sufficiency of an agency's alternative analysis where it considered two site alternatives, five layout alternatives, and a no-action alternative).

In this case, TVA failed to consider *any* meaningful alternatives to the Project and thus violated NEPA's requirements.

## IV.     TVA Improperly Refused to Analyze the South Rail Loop Landfill.

TVA contends that it need not evaluate the risks of the South Rail Loop ("SRL") Landfill because that component of the Project is speculative. Doc. 47 at 22. This contention mischaracterizes the status of the SRL Landfill, which is an essential component of the Project and is far from speculative. While an agency may defer evaluation of wholly speculative actions—those that "may or may not occur" at all—the necessity of the SRL Landfill is certain. AR 262, 370. The SRL Landfill has already been sited, and TVA's own calculations

demonstrate that it will be constructed and used for coal-combustion waste disposal during the life of the Project. *Id.*

"An agency may not segment a project into smaller projects . . . simply to expedite the NEPA process or avoid addressing environmental impacts." *W. N.C. Alliance v. N.C. Dep't of Transp.*, 312 F. Supp. 2d 765, 774-75 (E.D.N.C. 2003); 40 C.F.R. § 1508.27(b)(7). Actions are part of the same overall project if, for example, one action "automatically trigger[s]" another; one action "cannot or will not proceed unless" another action is "taken previously or simultaneously"; or the actions "are interdependent parts of a large action." 40 C.F.R. § 1508.25(a)(1)–(3). There is no question that the SRL Landfill is an integral component of the Project.

TVA mistakenly relies on cases in which future projects truly were speculative. In *City of Riverview v. Surface Transportation Board*, there were absolutely no details about the amount of barge traffic contemplated or the nature of the pier or dock to be built. *See* 398 F.3d 434, 442 (6th Cir. 2005). In *Bullwinkel v. U.S. Department of Energy*, there were no concrete plans for additional development within the same industrial site. *See* 899 F. Supp. 2d 712, 729–30 (W.D. Tenn. 2012). Here, the record unequivocally demonstrates that coal-combustion waste generated by the Project will need to be disposed of in the SRL Landfill. AR 262, 370.

## V.     TVA Excluded the Public from Its Decision to Continue Operating Gallatin.

TVA contends that it was not required to involve the public *at all* in its decision to spend $1.2 billion to enable continued operation of the Gallatin coal units, but that it nevertheless provided more than sufficient opportunity for public participation in the NEPA process. Doc. 47 at 23–24. TVA's contention undermines NEPA's fundamental purpose to foster excellent decision-making by "[e]ncourag[ing] and facilitat[ing] public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d).

"Because [NEPA] promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action . . . meaningful analysis and public comment [are] required prior to the approval" of a project. *Northwoods Wilderness Recovery, Inc. v. U.S. Forest Serv.*, 323 F.3d 405, 412 (6th Cir. 2003) (citations omitted)). The record demonstrates that TVA arrived at its decision to retrofit and continue operating the Gallatin coal units before seeking public input and without considering the environment. *See* AR 19035–58; 19059–80. TVA did not revisit that critical decision in the NEPA process. And TVA cannot cure its failure to involve the public by referring back (or "tiering") to its 2001 IRP process, because the IRP and associated EIS deferred "[o]ption-specific and/or site-specific environmental reviews," and so did not disclose or consider any site-specific impacts of the Project. AR 995; *see* AR 241, 554-55; *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("Though 'tiering' to a previous EIS is sometimes permissible, the previous document must actually discuss the impacts of the project at issue.").

## VI.   An EIS Is Required Because the Project Would Cause Significant Impacts to the Human Environment and Is Highly Controversial.

TVA contends that the impacts of the Project are not significant compared to its illegal "no action" baseline, that this Court must defer to TVA's conclusion, and that the 1,199 separate public comments on the Project only constitute "opposition" rather than controversy about the size, nature, or effect of the Project. Again, TVA misstates the facts and misapplies the relevant standards.

While courts are generally deferential to agency decisions that involve highly technical issues, "a court must look beyond the conclusory statements in an EA and examine whether the agency has provided a 'convincing statement of reasons why potential effects are insignificant.'"

*Hirt v. Richardson*, 127 F. Supp. 2d at 839 (citing *Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985); *Pub. Serv. Co. of Colo. v. Andrus*, 825 F. Supp. 1483, 1496 (D. Idaho 1993)). Where "the record establishes . . . that the defendants prejudged the NEPA issues . . . [t]his prejudgment diminishes the deference owed to the federal defendants in [the court's] review of their decision to issue a FONSI rather than an EIS." *Davis v. Mineta*, 302 F.3d at 1112. As demonstrated above, that is the case here.

Even when compared to TVA's illegal "no action" baseline, the Project will have significant impacts, including increased generation of coal-combustion waste and additional sources of water pollution, the closure of significant portions of the WMA, and setbacks in species protection at the Aquatic Center. The installation of air-pollution controls will cause the Gallatin Plant to generate two to five times more coal-combustion waste than it currently does, resulting in disposal of 411,000 to 877,000 tons of waste per year. AR 262. To accommodate this waste, TVA plans to construct two new 190-foot-tall landfills, which would bury over 170 acres within the WMA. AR 262, 335, 356. Runoff from the landfills would produce up to 300,000 gallons of leachate and would generate an average of 340,000 gallons of stormwater pollution each day. AR 340. While the Project will reduce emissions of some air pollutants, it will perpetuate the remaining emissions for decades to come. *See S. Fork Band Council*, 588 F.3d at 725–26 (where expansion of a mining operation would create "ten additional years . . . of environmental impacts," the agency must consider those impacts in an EIS). The added coal-ash production and landfills and the new water-pollution streams will harm the people and communities that surround the plant.

Despite this fact, TVA attempts to marginalize the 1,199 public comments from local citizens opposing the Project. Doc. 47 at 23–24. TVA dismisses the significance of

Case 3:13-cv-00374-TAV-HBG   Document 52   Filed 10/15/13   Page 29 of 33   PageID #: 1701

commenters' concerns as "grossly overstated," because Sierra Club provided postcards, emails, and other methods for its members to voice their concerns about the faulty assumptions, data, and methodology relied on by TVA in its *pro forma* NEPA process.  Doc. 47 at 26.  In its attempts to brush aside commenters' concerns as mere opposition, TVA misrepresents facts by stating that "none of the comments casts doubt on TVA's methodology or data."  *Id.*  This simply is not the case.  In fact, Plaintiffs and several other members of the public submitted voluminous comments calling into question the size, nature, and effect of the Project and expressing concern with the very same procedural NEPA violations described in this memorandum.[10]  This is not a case where the public comments merely expressed preference for a different outcome—commenters urged TVA to undertake a correct NEPA process from the outset.

Ironically, TVA also argues that comments urging TVA to consider the reasonable compliance alternatives specified in the Clean Air Act Settlements "'undermine[]the adequacy and legitimacy of [Plaintiffs'] comments and analyses.'"  *Id.* (quoting AR 481).  On the contrary, TVA's selection of an unlawful "no action" baseline and failure to meaningfully consider a single project alternative is what undermined the adequacy and legitimacy of its NEPA review.

Finally, TVA also attempts to distract from Plaintiffs' NEPA challenge by miscasting it as a subterfuge to shut down the Gallatin Plant.  The record and the law prove TVA wrong.  In *Pure Waters v. Michigan Department of Natural Resources*, the court refused to allow a project opponent to use NEPA to reverse an agency decision where the record clearly demonstrated that the agency considered and disclosed the environmental impacts of its preferred option before

---

[10] *See* AR 9436-37 (Comments on the Draft EA submitted on behalf of the Sierra Club, the Environmental Integrity Project, the Southern Alliance for Clean Energy, Earthjustice, and the Southern Environmental Law Center); AR 13517-25 (Supplemental Comments on the Draft EA submitted by the Sierra Club); AR 13869-76 (Comments on the Draft EA submitted by the Tennessee Environmental Council); and AR 13888-91 (Comments on the Draft EA submitted by the Center for Biological Diversity).

reaching its decision, considered a meaningful range of alternative projects, and involved the public extensively through convening a citizens' committee, delivering public presentations on the project and alternatives, and holding public hearings. 883 F. Supp. 199, 203 (E.D. Mich. 1995) (noting that "[p]ublic participation [including: mailing out newsletters; holding public meetings to discuss and inform residents of the project plan, environmental impacts anticipated, and estimated costs; and convening an ad hoc citizens committee as a forum to resolve concerns] was the key issue in the evaluation of alternatives and was a critical element in the selection of the proposed project"). If TVA had provided similar public disclosure and participation opportunities when it made the critical decision to control and continue operating the Gallatin coal units, and considered the environmental consequences of that decision and compared them with reasonable alternatives, this NEPA litigation could have been avoided.

Instead, TVA covertly decided to retrofit and continue operating the plant based on undisclosed studies that considered business metrics, not environmental concerns, and then attempted to justify its decision with an EA skewed to avoid any real analysis. This is not a case of a project opponent complaining that its preferred alternative was not selected. This is a case in which the public was completely cut out of an inadequate decision-making process. NEPA demands more.

## CONCLUSION

For all the reasons set forth above, Plaintiffs request that this Court deny TVA's motion for judgment on the administrative record, grant Plaintiffs' motion, set aside TVA's decision to retrofit and continue operating the Gallatin Plant, and require TVA to prepare an EIS that meets the requirements on NEPA.

Respectfully submitted this 15th day of October, 2013.


_____s/Nathan T. Moore_____
Nathan T. Moore, Staff Attorney
TN BPR # 31239
John Suttles, Senior Attorney
*Admitted Pro Hac Vice*
Delta Anne Davis, Managing Attorney
*Admitted Pro Hac Vice*
(Permanent Application Pending)
Myra Blake, Associate Attorney
*Admitted Pro Hac Vice*
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470

Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, and Sierra Club

_____s/Mary Whittle_____
Mary Whittle
*Admitted Pro Hac Vice*
EARTHJUSTICE
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA 19103
Telephone: (215) 717-4524

Bridget Lee
*Admitted Pro Hac Vice*
EARTHJUSTICE
156 William Street, Suite 800
New York, NY 10038
Telephone: (212) 845-7379

Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, Sierra Club, and Center for
Biological Diversity

## CERTIFICATE OF SERVICE

I certify that on October 15, 2013, the foregoing Plaintiffs' Memorandum in Opposition to TVA's Motion for Judgment on the Administrative Record  was filed electronically through the Court's ECF system.  Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

 /s/ Nathan T. Moore
Nathan T. Moore
TN BPR # 31239
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
Telephone:  (615) 921-9470
Facsimile: (615) 921-8011