UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TENNESSEE ENVIRONMENTAL COUNCIL,
TENNESSEE SCENIC RIVERS
ASSOCIATION, SIERRA CLUB, and
CENTER FOR BIOLOGICAL DIVERSITY,
Plaintiffs,

v.  No. 3:13-cv-00374

TENNESSEE VALLEY AUTHORITY,
Defendant.

**TENNESSEE VALLEY AUTHORITY'S REPLY BRIEF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiffs challenge TVA's NEPA review of its proposal to install air pollution controls at its Gallatin Fossil Plant. TVA proposed to install these controls in order to fulfill the goals of the TVA Act and to achieve the goal of "becom[ing] one of the nation's leading providers of low-cost and cleaner energy by 2020" that was set forth in TVA's 2011 Integrated Resource Plan (IRP). (AR 539.) TVA studied the proposed action, issued a draft Environmental Assessment (EA), amassed an Administrative Record of over 19,000 pages, considered all the action alternatives suggested by Plaintiffs, and ultimately issued a 171-page final EA. After that extensive review, TVA determined that no other alternative achieved its stated goals as well or as reliably as the installation of pollution controls at Gallatin. While Plaintiffs may be chagrined that their preferred alternatives were not chosen, "NEPA . . . does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Instead, NEPA's "mandate is . . . essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). TVA properly implemented that procedure here.

1

**STANDARD OF REVIEW**

Plaintiffs appropriately discuss the "arbitrary and capricious" standard applicable to Administrative Procedure Act (APA) cases such as this one, but erroneously include the Rule 56 standard of review. (Doc. 52 at PageID 1685.) That standard does not apply here because in cases reviewable under the APA there are no facts for the court to weigh. *See City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007); *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, No. 3:12-cv-82-TBR, 2013 WL 4516774, at *6 (W.D. Ky. Aug. 23, 2013) ("[I]n the case of a district court reviewing final agency action, the rules governing summary judgments do not apply because of the limited role of a court in reviewing the administrative record."); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007). Instead, this Court reviews TVA's actions solely on the Administrative Record. 5 U.S.C § 706 (2006); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). This review is narrow and confined to whether TVA's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted). There has been no such error and the Court should grant TVA's motion.

**ARGUMENT**

I. **TVA Did Not Predetermine Its Decision Or Prematurely Commit Resources.**

    A. **TVA contracts for preliminary design studies and cost estimates do not evidence predetermination.**

TVA does not dispute that it executed contracts prior to the completion of its NEPA review. Those contracts did not predetermine the result of the NEPA review however, because the only work completed under the contracts were preliminary design studies and cost estimates. (TVA Br., Doc. 47 at PageID 1597-99.) These preliminary studies and estimates provided

necessary information for TVA to ascertain whether the Gallatin pollution controls would be feasible, cost-effective, and environmentally sound. There is good reason that contracts for preliminary work do not evidence predetermination: "One cannot expect an agency in all cases to neatly proceed from environmental analysis to planning. Each endeavor inevitably impacts the other, and the CEQ regulations anticipate that 'agencies shall integrate the NEPA process with other planning.'" *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 205 (4th Cir. 2005) (quoting 40 C.F.R. § 1501.2) (citations and alterations omitted).

Plaintiffs' principal argument on this point — that TVA "ignored governing Sixth Circuit precedent" by failing to cite *Burkholder v. Peters*, 58 F. App'x 94 (6th Cir. 2003) — is incorrect. TVA did not cite to this unpublished Sixth Circuit case because it does not support the broad statement that Plaintiffs attribute to it. (Pls.' Br., Doc. 52 at PageID 1688.) *Burkholder* concerned the Ohio Department of Transportation's decision to relocate a 16-mile section of highway, and the NEPA review of the action by the Federal Highway Administration. 58 F. App'x at 96. The Sixth Circuit's opinion on the impropriety of the timing of the contract for final design work was prompted by a conflict of interest presented by the relationship between the state transportation department and its contractor. The contractor was responsible for both completing a "preliminary study of the project, including the EA" and undertaking "the engineering, design and construction work for the final highway project." *Id*. at 97. This dual role presented a conflict of interest prohibited by CEQ and Federal Highway Administration regulations. *Id*. The Sixth Circuit nonetheless found that the errors presented by the conflict of interest and the second contract for final design work were rendered "harmless" by the independent oversight provided by the Highway Administration. *Id*. at 100-01. The Sixth Circuit accorded deference to the Highway Administration's decision to approve the project despite the procedural missteps and concluded that "[i]t was sufficient that the EA discussed the

3

conflicting opinions, the agencies gathered additional data, hired a consultant to examine the objections raised by the appellants, and explained the basis for their conclusions." *Id.* at 102.

TVA's contracts with suppliers of highly specialized pollution control equipment that requires years to design and fabricate bears no resemblance to a contract for the study and preparation of an EA for a highway expansion. Moreover, the TVA contracts present no conflict of interest because the pollution control equipment vendors were not involved in the preparation of the EA which was done by TVA's in-house NEPA and environmental experts.

Nor did the contracts limit reasonable alternatives by committing federal funds prematurely.[1] Not only does TVA include "Termination for Convenience" clauses in its contracts (TVA Br., Doc. 47 at PageID 1598-99), but history has shown that TVA will terminate projects, even after the expenditure of significant funds, if it is not in the best interest of the Tennessee Valley region, is not cost-effective, or is not environmentally sound. One such example is the installation of pollution controls at Allen Fossil Plant that was contingently approved at the same time as the Gallatin project, but was terminated after initial studies (such as those done for Gallatin) revealed that a retrofit was not the advisable course. (AR 1; 473.) The execution of contracts and disbursement of a portion of approved funds prior to the completion of NEPA review here did not render the proposed project a fait accompli nor limit reasonable alternatives.

---

[1] TVA acknowledges that certain sums of money were contingently authorized for the projects and a subset of those authorized funds were expended for design and cost estimate work prior to completion of the NEPA review. The amounts, though large, are typical for the specialized and mammoth equipment being designed and built under these contracts. *Cf. Nat'l Parks Conservation Ass'n v. TVA*, No. 3:01-cv-71, 2010 WL 1291335, at *27, 30 (E.D. Tenn. Mar. 31, 2010) (holding that multi-million dollar maintenance projects at TVA's Bull Run were "unremarkable" when compared to similar projects at TVA and in the coal-fired power industry).

It is true, as TVA argued in its opening brief, that the project authorizations had no impact on the environment because they provided that "[n]o physical onsite construction can start until the project Phase 3 (addressing construction activities) is approved and required environmental approvals are obtained." (TVA Br., Doc. 47 at PageID 1598; AR 14642; 14699.) Plaintiffs attempt to manufacture a nefarious conspiracy by pointing to a contract clause that requires vendors to prefabricate and pre-assemble project elements offsite "to the maximum extent practical to reduce field erection time." (Pls.' Br., Doc. 52 at PageID 1688.) TVA did not include this clause in the contract in order to be able to argue that the project authorizations for preliminary studies created no impact on the environment. Rather, as is obvious from the schematic depiction of the plant and the construction site (AR 6092; 6093), the prefabrication and preassembly clause was a necessity dictated by the limited space available onsite for creating "laydown areas" for the assembly of massive air pollution controls.

### B. The contingent Board approval does not indicate predetermination.

The TVA Board of Directors

> approve[d] the [Gallatin] Project, with a budget of up to $1.1 billion, and recognize[d], pursuant to [its delegation of authority] Practice, that the CEO has the authority to take such actions, *including the execution of such agreements and other instruments as may be necessary to implement . . . the [Gallatin] Project within the scope and budget approved by the Board* [and provided that] implementation of this Board action will be subject to satisfactory completion of all required environmental reviews under the National Environmental Policy Act and other applicable environmental reviews.

(AR 1, emphasis added.) In so doing, the TVA Board did not authorize a "sham" environmental review as Plaintiffs claim. (Pls.' Br., Doc. 52 at PageID 690.) Moreover, as the emphasized language demonstrates, the Board authorization delegated authority to execute contracts necessary to implement the project. As discussed in TVA's opening brief and in the EA, the impending deadlines of the Clean Air Agreements and the MACT Rule together with the long

5

lead time for design of the huge and technically complex control equipment necessitated some preliminary work to proceed concurrently with the NEPA review. (TVA Br., Doc. 47 at PageID 1591; AR 472-73.) To have done otherwise would have taken an available alternative off the table by default.

### C. TVA did not conduct any analyses "outside the NEPA process."

Plaintiffs claim that TVA violated NEPA because it conducted analyses as to the reliability and efficiency of units on the TVA system, upon which the Gallatin-specific analysis was premised, "outside the NEPA process." This is incorrect. Those analyses were done for TVA's 2011 IRP which was not only open to extensive public participation but which employed a Stakeholder Group in its development. (TVA Br., Doc. 47 at PageID 1590, 1599-600.)

Plaintiffs are also wrong that TVA made a "bald assertion" when it argued that the Sierra Club was privy to those foundational analyses. Sierra Club members were part of the IRP Stakeholder Group. TVA created this Group to obtain input from representatives from the diverse stakeholders in the Tennessee Valley region who are directly influenced by TVA's actions. The Stakeholder Group included representatives from industry, environmental advocacy groups, academia, and state resource agencies. Ms. Louise Gorenflo of Crossville, Tennessee, a member of the Sierra Club, was part of the Group, and a second member of Sierra Club was designated as her alternate if she were unable to attend meetings. See http://www.tva.com/environment/reports/irp/archive/.[2] The Stakeholder Group participated in at least fifteen meetings where information was provided on topics relevant to achieving TVA's

---

[2] Information posted on the website of TVA, a corporate agency and instrumentality of the United States, is the type of information of which courts routinely take judicial notice. *See, e.g., Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 n.22 (10th Cir. 2009); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003); *U.S., Cal., & Fla. ex rel. Fry v. Guidant Corp.*, No. 3:03-0842 , 2006 WL 2633740, at *9 (M.D. Tenn. Sept. 13, 2006).

future vision of a more balanced energy portfolio. *Id.* TVA shared detailed descriptions and presentations of the method by which the units in TVA's coal fleet would be ranked for retirement consideration and the nine factors that informed the unit ranking process: operating cost, equivalent forced outage rate, transmission impact, remaining clean air capital, fixed Operations and Maintenance and year capital, future ash handling costs, fuel flexibility, required capital improvements, and $CO_2$ intensity. *Id.* Other information discussed with the Stakeholder Group included forecasts of environmental regulation, energy demand, predicted economic development of the Tennessee Valley region, and commodity pricing, among other items. *Id.* These materials provided the foundation for the more specific analysis as to whether to control, convert or retire the Gallatin plant that was conducted for the Gallatin EA.

Plaintiffs also incorrectly argue that the joint motion for this Court to enter the Clean Air Act Agreements did not mention the system planning analyses. (Pls.' Br., Doc. 52 at PageID 1691.) To the contrary, the motion states:

> In accordance with the TVA Act, TVA recently completed its 2011 Integrated Resource Plan ("IRP"), entitled "TVA's Environmental and Energy Future." ***Developing this plan required the use of comprehensive economic least-cost modeling and consideration of potential financial and environmental effects***. The IRP process included widespread public participation and opportunities for public comment.

Joint Motion to Enter Consent Decree, *Alabama v. TVA*, No. 3:11-cv-170, *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, No. 3:11-cv-171, at 17 (E.D. Tenn. June 16, 2011) (emphasis added).

### D. Aquatic Center.

TVA included the emails and letters between TVA and TWRA at Plaintiffs' request to provide context for the relocation of the Aquatic Center, but that correspondence is not part of the official Administrative Record because they were not documents upon which TVA based its

decision. These extra-record emails and letters concerning the Aquatic Center chronicle a dialogue between TVA and TWRA that is amenable to different interpretations. However, "[i]n determining whether an agency prejudged the impact of its intended actions, courts look primarily to the EA itself, rather than attempting to divine 'the alleged subjective intent of agency personnel . . . through selective quotations from email trails.'" *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 287 (D. Del. 2011) (quoting *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 199 (4th Cir. 2005)).

Notwithstanding the fact that the parties present different interpretations of this correspondence, the fact remains that:

> [i]n consultation with the USFWS, TVA is committing to rebuilding the hatchery at another location on the GAF plant site, farther away from the plant and Alternative 2 footprints. TVA is working with TWRA on the design of the new hatchery and the two agencies anticipate improvements in the design of the new hatchery. TVA also is committing to providing TWRA longer term tenure over the new hatchery site. . . . An improved design and longer tenure is expected to enhance TWRA's species propagation activities. . . . TWRA has informed TVA that it is taking care to minimize potential impacts from relocating and housing the species under its control in the interim. . . . USFWS also concurred with TVA's determination that the proposed projects are not likely to adversely affect . . . any of the listed mussel species held by TWRA at the hatchery.

(AR 361; *see also* Pls.' Br., Doc. 52 at PageID 1692.) Thus, even if NEPA were violated in connection with the relocation of the hatchery, which TVA maintains it was not, any such procedural violation has been remedied. Courts have affirmed agency decisions under similar circumstances. *See Burkholder*, 58 Fed. App'x at 100-02 (finding that violations of NEPA committed by state transportation department were cured and rendered "harmless"); *see also Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 432-33 (4th Cir. 2012) (finding that Natural Resources Conservation Service's alleged failure to ask Army Corps to participate as a cooperating agency was harmless error); *Nevada v. Dep't of Energy*, 457 F.3d 78, 89-90 (D.C. Cir. 2006) (declining to decide whether DOE's failure to identify a preferred alternative violated

NEPA because the omission was cured and therefore constituted harmless error); *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997) ("[T]his court applies a harmless-error rule to APA cases, such that a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing the agency's determination.").

**II.    TVA Considered The Correct "No Action Alternative."**

Plaintiffs argue that TVA should have used the status quo *as of 2017* as the "no action alternative." This is so, they argue, because the Clean Air Act Agreements require TVA to install pollution controls, convert to biomass, or retire Gallatin by that date, which is seven years after the Agreements were signed, and three years after the Gallatin NEPA review was completed. (Pls.' Br., Doc. 52 at PageID 1693-95.)

This argument is wrong for the reasons discussed in TVA's opening brief. (TVA Br., Doc. 47 at PageID 1601-02.) Judging the proposed action against a future reality would conflict with CEQ guidance that instructs agencies to compare the proposed action to a "no action" alternative, which is defined as the situation that would exist if "the proposed activity would not exist . . . *even if the agency is under a court order or legislative command to act*." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (emphasis added).

Plaintiffs support their approach by deeming Gallatin's current operations as "unlawful" and "illegal." (Doc. 52 at PageID 1693-95.) Gallatin's operations are neither unlawful nor illegal. Indeed, in the EA, TVA highlighted the distinction between current, lawful, permitted operations and the situation that would exist if the same operations were conducted past 2017. TVA "acknowledge[d] that it would have to cease operating Gallatin [in 2017] to not violate existing legal requirements if those requirements are not changed" but nonetheless recognized

that CEQ regulations required TVA to evaluate the proposed action against the *current* reality of Gallatin's operations.

Plaintiffs' argument that TVA should have assumed the **non-operation of Gallatin** as the no action alternative also contradicts the well-established principle that an agency cannot assume an option under consideration in its "no action" comparison. *See, e.g. Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037-38 (9th Cir. 2008) ("The baseline alternative should not have assumed the existence of the very plan being proposed.") (citation, internal quotation marks, and alterations omitted).

Finally, Plaintiffs claim that the cases cited by TVA address an inapplicable "second scenario . . . *i.e.*, a situation where an existing management plan (such as a land or fisheries management plan) requires periodic updating." (Pls.' Br., Doc. 52 at PageID 1694.) This argument is a semantic sleight-of-hand. There is no such distinction for "management plans." Even if there were, the correct "management plan" to consider would be Congress's directive to TVA to provide reliable low cost energy to the inhabitants of the Tennessee Valley region. The most recent iteration of this "management plan" can be found in TVA's 2011 IRP, as described by TVA's CEO: "to achiev[e] a more balanced, diverse portfolio of energy resources on the TVA system [which] includes continued use of some of TVA's coal-fired resources." (AR 536.)

## IV. TVA Analyzed All Reasonable Alternatives.

In defining a project's objectives, agencies are counseled to consider the needs and goals of the parties involved and congressional indicia of agency purpose. (TVA Br., Doc. 47 at PageID 1603, citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.)). Which alternatives are studied and the extent to which they are discussed is within the discretion of the agency. (TVA Br., Doc. 47 at PageID 1603-04.) Moreover, agencies

are permitted to identify a preferred alternative and have that preferred alternative guide its NEPA analysis. (TVA Br., Doc. 47 at PageID 1605.)

Here, TVA defined the purpose of its proposed action as achieving a more balanced energy portfolio. This purpose took account of the congressional goals of providing reliable, low-cost power to the citizens of the Tennessee Valley region while protecting the resources of the area. Because the alternatives which Plaintiffs prefer did not achieve the project's objectives, they were discussed in less depth than those alternatives which did achieve the project's objectives. This approach is in accordance with NEPA. *See, e.g., Buck Mountain Cmty. Org. v. TVA*, 629 F. Supp. 2d 785, 798 (M.D. Tenn. 2009).

Plaintiffs state that courts which approve the approach used by TVA here do so only when plaintiffs fail to identify any alternatives that the agency should have considered but did not. (Pls.' Br., Doc. 52 at PageID 1697.) These cases fit the current situation because TVA *did* study all the alternatives suggested by Plaintiffs, including full and partial retirement of the Gallatin units, replacing Gallatin with renewable biomass or renewable resources, converting Gallatin to natural gas, and replacing Gallatin's generation with savings from energy efficiency programs. (AR 271-74; 442-510.)

Plaintiffs also argue that the courts approving the approach used by TVA here did so because the agency considered a broad range of reasonable alternatives. This too counsels in favor of TVA's Gallatin analysis. TVA considered a total of nine alternatives in varying levels of depth analysis according to their ability to achieve the project's objectives. The requisite "no action" alternative was discussed as a baseline, six alternatives which did not achieve the project's objectives were discussed briefly, and two alternatives that achieved the project's objectives were discussed in-depth. The approach of using varying levels of analysis for

alternatives that do and do not achieve a project's objectives has been affirmed repeatedly by courts within and without the Sixth Circuit. (TVA Br., Doc. 47 at PageID 1603-05.)

V.      **TVA Did Not Segment Analysis Of The South Rail Loop.**

Whether the South Rail Loop Landfill will be needed is dependent upon myriad factors including future energy demand, coal type, the production rate of combustion waste, future combustion waste regulation, as well as the outcome of studies on high-volume uses for coal combustion waste currently being conducted by the Electric Power Research Institute. (AR 262-64; 369.) Deferring analysis of less imminent and speculative eventualities is appropriate. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976) (NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions").

Plaintiffs claim that the South Rail Loop Landfill is part of the same overall project and therefore had to be analyzed in this EA. (Pls.' Br., Doc. 52 at PageID 20.) They are incorrect. The installation of air pollution controls and the construction of the North Rail Loop Landfill can proceed without the South Rail Loop Landfill, and neither project "automatically trigger[s]" the South Rail Loop Landfill because the North Landfill is estimated to have a useful life of between seven and fifteen years. (AR 262.) Future energy demand, future regulation, and future energy pricing are all uncertainties that make the question of whether the North Rail Loop Landfill will reach capacity and require the construction of the South Rail Loop Landfill sufficiently speculative to warrant deferring analysis of the South Rail Loop Landfill.

VI.     **The Public Was Involved In The NEPA Process.**

Contrary to Plaintiffs' argument, TVA does not "contend that it was not required to involve the public *at all* in its decision" to install pollution controls on its Gallatin plant. (Pls.' Br., Doc. 52 at PageID 1699.) TVA well understands the importance that residents of the

12

Tennessee Valley region place on TVA's provision of electricity that is simultaneously reliable, low cost, and environmentally sound. This is exactly why TVA engaged the public in the development of its overall energy vision for the future in the 2011 IRP, which laid out the guiding plan to rely more heavily on "nuclear and natural gas energy generation, renewable energy and energy efficiency; energy resources that are cleaner than coal-fired generation" while still relying on some coal-fired resources in order to achieve a balanced, economical energy portfolio. (AR 536; AR 538-754.) And this is why, despite the fact that CEQ regulations do not *mandate* specific parameters for public involvement in the preparation of an EA, *see* 40 C.F.R. § 1501.4(b) ("The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [environmental] assessments."), TVA provided the public with a comment period on the draft EA that was extended by 14 days. Thus, the public comment period was only one day shorter than the minimum days required under CEQ's and TVA's NEPA procedures for EISs. And, as noted in TVA's opening brief, TVA additionally agreed to accept late comments from a number of environmental advocacy groups, including Plaintiffs here, making their total comment period 61 days. (TVA Br., Doc. 47 at PageID 1607; AR 474-77.)

**VII.    NEPA Does Not Require An EIS In This Case.**

"The regulations make it clear that full-scale environmental impact statements – statements that are 'very costly and time-consuming to prepare and [have] been the kiss of death to many a federal project,' – need not be prepared for every major Federal action that might conceivably have a significant effect on the quality of the human environment." *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) (quoting *Cronin v. U.S. Dep't of Agric.,* 919 F.2d 439, 443 (7th Cir.1990)). "NEPA does not require that the agency find absolutely no adverse consequences in order to avoid the preparation of an EIS. It merely requires that the agency find there will be no *significant* adverse impacts." *Southern Four Wheel*

*Drive Ass'n v. U.S. Forest Serv.*, No. 2:10cv15, 2012 WL 4106427, at *13 (W.D.N.C. Sept. 19, 2012) (rejecting plaintiffs' argument that an EIS is required any time a project would affect the public's use of resource as "render[ing] the [NEPA] regulation meaningless"); *Friends of Fiery Gizzard*, 61 F.3d at 504-05.

As recited in TVA's opening brief, TVA considered all the "intensity" factors enumerated in 40 C.F.R. § 1508.27 (a), (b), and determined that the installation of air pollution controls at Gallatin would not have significant adverse effects on the human environment, but would "substantially reduce [air] emissions and offer better protection of potentially impacted resources than do the plant's wet ash impoundments." (TVA Br., Doc. 47 at PageID 1608-09; AR 474.) The presence of some intensity factors does not require a finding of significance; rather, the agency must demonstrate that it addressed and evaluated the relevant factors. *Del. Audubon Soc'y v. Salazar*, 829 F.2d 273, 284 (D. Del. 2011).

TVA does not seek to "marginalize" the public comments it received (Pls.' Br., Doc. 52 at PageID 1701-02), merely to point out that 855 of 1199 comments were "robo-comments" from individual members of Plaintiff Sierra Club. These comments were generalized, pre-printed statements voicing opposition to the proposed project. (AR 441; *e.g.*, 8160-8767; 8779-9404.) TVA took great care in organizing and answering all the comments it received and provided detailed answers to the substantive comments, including the comments submitted by Plaintiffs and other members of the public. (AR 442-498.) TVA concluded that those comments were misdirected because they compared the proposed project to a future baseline of the legal requirements in 2017 (AR 481), which as discussed above, in an incorrect "no action" alternative.

14
Case 3:13-cv-00374-TAV-HBG   Document 54   Filed 10/25/13   Page 14 of 16   PageID #: 1721

## CONCLUSION

For these reasons and the reasons stated in TVA's opening brief in support of its motion for judgment, TVA asks this Court to grant TVA's Motion for Judgment on the Administrative Record.

Respectfully submitted,

*s/Maria V. Gillen*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Tricia A. Roelofs, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

19750617

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority

16
Case 3:13-cv-00374-TAV-HBG   Document 54   Filed 10/25/13   Page 16 of 16   PageID #: 1723