# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### NORTHERN DIVISION

|  |  |  |
|---|---|---|
| TENNESSEE ENVIRONMENTAL COUNCIL, TENNESSEE SCENIC RIVERS ASSOCIATION, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) ) |  |
|  | ) | Case No. 3:13-cv-00374 |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Chief Judge Thomas A. Varlan Magistrate Judge H. Bruce Guyton |
| TENNESSEE VALLEY AUTHORITY, | ) ) |  |
| Defendant. | ) ) |  |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STANDARD OF REVIEW ......................................................................................................2

ARGUMENT ............................................................................................................................3

    I.    TVA's Decision to Prolong Operation of the Gallatin Plant Is a Major
        Federal Action That Was Never Subjected to NEPA Review. ........................................3

        A.    TVA Did Not Evaluate Environmental Factors When It Decided to
               Retrofit Gallatin. .....................................................................................................3

        B.    TVA Did Not Involve the Public in Its Decision to Keep Operating
               Gallatin. ...................................................................................................................7

    II.    TVA Began Implementing Its Decision Before Undertaking the Required
        NEPA Analysis. ...............................................................................................................8

    III.    The EA for TVA's Predetermined Project Does Not Satisfy NEPA. ...........................11

        A.    TVA Did Not Consider the Environmental Impacts of Alternatives. ...................11

        B.    TVA Failed to Consider the Harmful Effects of Its Decision. .............................13

        C.    TVA Provides No Record Evidence to Support Its Segmentation
               Argument. ...............................................................................................................14

    IV.  TVA Should Have Prepared an EIS for the Gallatin Project. ........................................16

CONCLUSION.......................................................................................................................19

## INTRODUCTION

In opposing Plaintiffs' motion for summary judgment, Defendant Tennessee Valley Authority ("TVA") attempts to complicate and clutter the case with irrelevant facts and arguments. Plaintiffs' case is simple and straightforward: TVA decided to prolong operation of the Gallatin coal units based on undisclosed economic analyses that did not consider the environment and did not include the public. After making that decision, TVA began implementing it before commencing or completing the environmental review required by the National Environmental Policy Act ("NEPA"). TVA compounded this error by failing to evaluate any alternatives or the full impacts of that decision in the EA it prepared.

TVA does not contend that it conducted the required NEPA review when it decided to continue operating Gallatin, but attempts to justify this omission by suggesting its "multi-faceted mission" mitigates its obligation to comply fully with NEPA. TVA Resp., Doc. 56, PageID 1731. The fact that TVA has a mission comprising elements other than environmental protection is not unique; it is a feature common to virtually all federal agencies. That is why Congress enacted NEPA: to ensure that, in fulfilling their broader mandates, federal agencies "take a 'hard look' at the environmental implications of their actions." *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001) (*quoting Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

TVA also misses the point by accusing Plaintiffs of having a single-minded focus on the environment. TVA Resp., Doc. 56, PageID 1731. Plaintiffs do not contend that economic considerations should have *no* bearing on TVA's decision whether to continue operating the Gallatin coal units. But in making this decision, NEPA requires that TVA also must consider environmental values and consequences, and that it must do so early enough and in such a way

as to contribute to the decision-making process, rather than merely justifying a decision already made.  TVA's failure to do so here is especially egregious, as the decision was a "close question" even when the environment was not taken into account.  AR 537.

## STANDARD OF REVIEW

This Court reviews motions for summary judgment in NEPA cases pursuant to Federal Rule of Civil Procedure 56.  *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 337, 351 (6th Cir. 2006) (affirming the trial court's grant of summary judgment under Rule 56 (*see Save Our Cumberland Mountains v. Norton*, No. 3:03-cv-00462, Doc. 113 (E.D. Tenn., Feb. 23, 2005) (J. Varlan))).  TVA now claims that Plaintiffs "erroneously include the Rule 56 standard of review."  TVA Reply, Doc. 54, PageID 1709; TVA Resp., Doc. 56, PageID 1732 n.2.

Yet TVA itself has recognized this as the appropriate standard and moved this Court for summary judgment pursuant to Rule 56 in a recent NEPA case, *Sherwood v. TVA*, arguing there that "[s]ummary judgment is particularly appropriate."  *See* TVA's Br. in Supp. of Its Mot. for Summ. J. on Count II (the NEPA Count) of the Second Am. Compl., Doc. 130, PageID 24040 n.1, No. 3:12-cv-00156 (E.D. Tenn. Sept. 17, 2012).  In *Sherwood*, this Court confirmed, "[s]ummary judgment . . . is a particularly useful method of reviewing federal agency decisions because 'the sole question at issue [is] a question of law,' and the underlying material facts are contained in the administrative record."  *Sherwood v. TVA*, No. 3:12-cv-00156, 2013 WL 3834041 at *2 (E.D. Tenn., July 23, 2013) (J. Varlan) (internal citation omitted).

All parties agree that the applicable legal standard in NEPA cases brought under the Administrative Procedure Act ("APA") is whether the challenged agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* Pls.' Resp., Doc. 52, PageID 1685; TVA Reply, Doc. 54, PageID 1709.  In applying this standard, a court should not replace a complete, existing administrative record with one newly created by the court, *Camp*

*v. Pitts*, 411 U.S. 138, 142 (1973), but should make a "searching and careful" inquiry of the entire record before the agency at the time of its decision, *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Nothing in the Rule 56 standard for summary judgment limits the Court's ability to determine the completeness of the administrative record, which, TVA has acknowledged, "of course[] consists of the materials compiled by the agency that were before the agency at the time of the decision at issue." *Sherwood v. TVA*, No. 3:12-cv-00156, Doc. 130, PageID 24052. The administrative record in this case includes, at a minimum, all of the documents lodged by TVA with the Court.[1]

## ARGUMENT

**I.  TVA's Decision to Prolong Operation of the Gallatin Plant Is a Major Federal Action That Was Never Subjected to NEPA Review.**

**A.  TVA Did Not Evaluate Environmental Factors When It Decided to Retrofit Gallatin.**

TVA's major federal action—its decision to prolong operating Gallatin, and thereby subject the environment to enormous amounts of additional air and water pollution for two or more decades—was conducted wholly without NEPA review. By TVA's own admission, the 2011 Integrated Resource Plan ("IRP") and associated Environmental Impact Statement ("EIS") did not address this decision: the EIS "was not intended to address the site-specific issues . . . for the Gallatin Fossil Plant." AR 480.

---

[1] TVA attempts to draw an artificial distinction whereby Documents 341–452, which it certified as part of the Administrative Record, are somehow outside the "official" record. *See* TVA Reply, Doc. 54, PageID 1714–15 (incorporated in TVA Resp., Doc. 56, PageID 1740). TVA's attempt to categorize these documents as "extra-record" evidence is mistaken. The administrative record includes all of the Administrative Record documents lodged with the Court, because they were before TVA during the NEPA process. *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (the administrative record comprises all documents "before the agency at the time the decision was made.").

Nor did TVA address this decision in the Gallatin Environmental Assessment ("EA"). As TVA notes, the EA merely "analyzes the impacts [of] Gallatin's continued operation as a ***controlled*** coal plant," and not TVA's prior decision to install controls and prolong Gallatin's operation. TVA Resp., Doc. 56, PageID 1737 (emphasis in original). In short, this major federal action was never analyzed in either the IRP proceeding *or* in the Gallatin EA: TVA made this critical decision, began implementing it, and only then conducted a cursory and circumscribed analysis of a small part of the implications of that decision.

The record proves the point. TVA has failed to identify any evidence in the administrative record (or anywhere else) to show that it conducted the careful environmental analysis NEPA requires when it decided to prolong operation of the Gallatin coal units. Instead, TVA contends that it "extensively assessed the environmental consequences" of its decision to continue operating Gallatin because "environmental considerations are ***assumed*** and ***embedded***" in its calculation of regulatory compliance costs in its 2010 Coal Unit Group Rankings and 2011 Final Fossil Fleet Recommendations. TVA Resp., Doc. 56, PageID 1736 (emphasis in original).[2] In fact, TVA's explanation demonstrates just the opposite: TVA did not extensively assess the environmental consequences of its decision to retrofit and continue operating Gallatin, but based that decision on an analysis of economic considerations that are not a surrogate for NEPA review. 40 C.F.R. § 1501.2(b) (NEPA requires that agencies "shall . . . [i]dentify environmental effects and values in adequate detail so they can be compared to economic and technical analyses").

---

[2] TVA also attempts to conflate impacts to the environment (which it is obligated to consider under NEPA) with environmentally themed impacts to its budget (which have little or nothing to do with NEPA).

Plaintiffs do not contest that TVA's *economic* analysis of continued operations must naturally take into account the cost of emissions controls and other measures necessary to bring the Gallatin coal plant into compliance with environmental regulations. TVA correctly assumed in its 2010 Unit Group Rankings and its 2011 Final Fossil Fleet Recommendations that, if it were to continue to operate the coal units legally, it would have to install emissions controls. The costs of these controls are the "environmental considerations" to which TVA refers as being "assumed and embedded" in its fleet-wide assessments. But those studies did not even identify, much less consider and balance, environmental impacts, and TVA is wrong to characterize its assumptions about the *cost* of environmental compliance as an extensive analysis or comparison of environmental *impacts*.

As a result of this error, TVA failed to satisfy NEPA's core directive that agencies "take a 'hard look' at the environmental implications of their actions." *Sw. Williamson Cnty. Cmty. Ass'n*, 243 F.3d at 278 (*quoting Kleppe*, 427 U.S. at 410 n.21). To satisfy NEPA's "hard look" requirement, an agency must "insure that more than economic costs alone are considered." *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 386–87 (2d Cir. 1975). "NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties." *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971). Where, as here, an agency "decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." *Id.* TVA did not even identify, much less consider and balance, any environmental factors in its 2010 Unit Group Rankings and 2011 Final Fossil Fleet Recommendations.

In an attempt to obscure its failure to consider the environmental consequences of its decision to prolong operation of the Gallatin coal units, TVA also points to its 2011 IRP and associated EIS and the Gallatin Final EA. None of these documents, singly or in combination, provides the careful and individualized consideration of the environmental consequences of the decision that NEPA requires. TVA's 2011 IRP is a broad, system-wide planning document that does not even mention the Gallatin Plant. *See* Pls.' Mem., Doc. 51, PageID 1634. The EIS prepared in conjunction with the IRP has a similarly generic focus and expressly defers making facility-specific determinations. *Id.*

Contrary to TVA's assertion, the post-hoc rationalizations and conclusions of the Final EA do not deliver the detailed analysis of environmental values, consequences, and reasonable alternatives that were missing from the IRP and that NEPA requires. 40 C.F.R. § 1501.2(b), (c). By the time TVA prepared the Final EA, it had already decided to install controls and continue operating the Gallatin coal units based on the economic planning factors contained in the 2010 Unit Group Rankings and the 2011 Final Fleet Recommendations; it had obtained TVA Board approval to implement the project; it had executed contracts worth almost $674 million to construct the project; and it had incurred over $45 million in equipment and materials purchases and construction charges. *See* Pls.' Mem., Doc. 51, PageID 1637. As TVA explained in the Final EA, it did not give meaningful consideration to any alternative other than continued operation because "[a]ll four of the coal-fired units operating at [Gallatin] were ranked in the unit grouping that the IRP studies indicated should be considered last for retirement." AR 273. Having made that decision, TVA's analysis of the environmental consequences of retiring the Gallatin coal units was limited to the axiomatic statement that, as compared to continued

operation with the proposed air pollution controls, retirement "would further reduce emissions from the plant." AR 272. This hardly amounts to the careful analysis NEPA requires.

**B.     TVA Did Not Involve the Public in Its Decision to Keep Operating Gallatin.**

TVA does not claim that it engaged the public in conducting and preparing the 2010 Unit Group Rankings and the 2011 Final Fossil Fleet Recommendations in which it decided the Gallatin coal units would not be considered for retirement. Rather, it sidesteps this omission and argues that, by engaging stakeholders in the 2011 IRP process and providing an opportunity for comment on the Gallatin Draft EA, TVA satisfied NEPA's public participation requirements for its Gallatin retrofit decision. *See* TVA Resp., Doc. 56, PageID 1737–38. But neither the 2011 IRP nor the Draft EA fulfills NEPA's purpose of "insur[ing] that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

Insofar as the 2011 IRP stakeholder process is concerned, TVA is mistaken for precisely the same reasons that the IRP is not an adequate surrogate for NEPA review of the decision to continue operating the Gallatin coal units. As TVA now acknowledges, the 2011 IRP involved broad, system-wide planning; it did not purport to involve a Gallatin-specific decision.

TVA's attempt to justify keeping the public in the dark about the facts and data that underpinned its decision also fails. It does not dispute, and in fact admits, that it did not provide the 2010 Unit Group Rankings and 2011 Final Fossil Fleet Recommendations to the public until it filed the administrative record in this case. *See* TVA Resp., Doc. 56, PageID 1738 n.3. TVA argues instead that it properly withheld this information from the public because it contained sensitive data that is exempt from disclosure under the Freedom of Information Act. *Id.*

TVA is wrong. While deliberative materials may be protected from disclosure, agencies must still provide the public with "purely factual, investigative" materials, as long as those

factual materials can be separated from any protected material in the same document. *Parke,*

*Davis & Co. v. Califano*, 623 F.2d 1, 5 (6th Cir. 1980) (*citing Envtl. Prot. Agency v. Mink*, 410

U.S. 73, 89, 93 (1973)); *Mink*, 410 U.S. at 87 ("[M]emoranda consisting only of compiled factual

material or purely factual material contained in deliberative memoranda and severable from its

context would generally be available for discovery."). TVA therefore cannot claim that the

factual data underlying its analyses were protected. Yet TVA has never made these data

available to the public, despite repeated requests. AR 13515-17.

The comment period on the Gallatin Draft EA likewise did not provide the public

adequate information or an opportunity to participate in TVA's decision. By the time it issued

the Draft EA and invited public comment, TVA had already decided to continue operating the

Gallatin coal units. Having already made this critical decision, the retrofit project became a

foregone conclusion and reduced the public comment period to a charade.

TVA also makes the circular argument that by submitting comments on the Draft EA,

Plaintiffs undermined their claim that TVA failed to provide sufficient information about the

retirement analysis for Gallatin to allow a fully informed public discussion. *See* TVA Resp.,

Doc. 56, PageID 1740. In their comments on the Draft EA, however, Plaintiffs and others

objected precisely to TVA's failure to provide information about the facts, data, and

considerations on which TVA based its decision. AR 9415–16. As Plaintiffs pointed out in

those comments, "[t]his flaw alone renders TVA's NEPA process inadequate." AR 9416.

## II. TVA Began Implementing Its Decision Before Undertaking the Required NEPA Analysis.

TVA does not dispute that it executed $141 million in contracts for permanent material

purchases, equipment purchases, subcontracting work, and construction management support for

the Project—and actually spent more than $12 million under those contracts—*before* it issued

the Draft EA. TVA Reply, Doc. 54, PageID 1709; TVA Resp., Doc. 56, PageID 1735–36.

Likewise, TVA does not attempt to deny that, before issuing the Final EA and FONSI, it spent more than $45 million implementing the Project and had contracted for $674 million—more than half the entire Project budget—for the design, provision, and installation of dry flue gas desulfurization, selective catalytic reduction, by-product handling systems, and related facilities. TVA Reply, Doc. 54, PageID 1709; TVA Resp., Doc. 56, PageID 1735–36.

Instead, TVA suggests that all of its pre-NEPA contracts were permissible because they were merely "preliminary design studies and cost estimates." TVA Reply, Doc. 54, PageID 1709; TVA Resp., Doc. 56, PageID 1735–36 (addressing contracts that TVA entered into with URS International, but not even attempting to explain away contracts with Riley Power, Inc., Foley Company, and Alstom Power, Inc.). However, the record and the case law prove otherwise: that these were substantive, comprehensive construction contracts that clearly crossed the line from permissible preparation to impermissible pre-NEPA implementation. *See* Pls.' Mem., Doc. 51, PageID 1634–35.

TVA has made no attempt to distinguish the applicable NEPA regulations and case law, except to point out that the Sixth Circuit's conclusion in *Burkholder v. Peters*, 58 F. App'x 94 (6th Cir. 2003)—that "a contract for final design work . . . clearly violate[s]" NEPA regulations prohibiting "any action that would 'limit the choice of reasonable alternatives'" (citing 40 C.F.R. § 1506.1(a)(2))—was prompted by different facts involving a federal agency, a state agency, and a private contractor. TVA Reply, Doc. 54, PageID 1710. In *Burkholder*, a state agency's otherwise impermissible pre-NEPA execution of contracts for final design work was ruled harmless because no *federal* expenditures or obligations had accrued. *Burkholder v.Wykle*, 268 F. Supp. 2d 835, 845 (N.D. Ohio 2002*), aff'd sub nom. Burkholder v. Peters*, 58 F. App'x 94 (6th

Cir. 2003). The opposite is true here, where TVA expended $45 million and committed to $674 million in work that included not only final design work, but also materials procurement and installation work, which clearly violates NEPA's prohibition on irreversible commitments of resources.

TVA also mischaracterizes the significance of its pre-NEPA directive to the Tennessee Wildlife Resources Agency ("TWRA") to close and dismantle the highly successful Cumberland River Aquatic Center, suggesting that the Court should excuse its actions because "a mutually acceptable solution [to siting and paying for the relocation] . . . was ultimately found." TVA Resp., Doc. 56, PageID 1740. In the process, TVA ignores the fact that its actions resulted in physical impacts to the environment, including premature release of juvenile mussels and sturgeon and significant disruption of TWRA's ongoing breeding and propagation efforts.

However, TVA's directive to dismantle the Aquatic Center is significant for more than its physical impacts on the center and the river ecosystem: TVA's direction to TWRA to close the Aquatic Center to make room for the Project demonstrates clearly that TVA had already decided to undertake the Project before it issued the Draft EA and before it even began engaging the public.[3] As discussed in Plaintiffs' prior briefing, the record makes clear that TVA decided to undertake the Project, immediately began executing contracts, and ordered the irreversible dismantling of the Aquatic Center to facilitate that decision. *See* Pls.' Mem., Doc. 51, PageID 1633–35.

---

[3] TVA attempts to obfuscate the issue further by suggesting that correspondence documenting TVA's directive to TWRA to close and dismantle the Cumberland River Aquatic Center, sent *before* TVA prepared even a Draft EA, "is not part of the official Administrative Record because they were not documents upon which TVA based its decision." TVA Reply, Doc. 54, PageID 1714-15. TVA mistakes the point: Plaintiffs do not suggest that TVA's instruction to TWRA to close the center formed the *basis* of TVA's decision, but rather it demonstrates that the decision had already been made before TVA began the NEPA process.

**III.**    <u>The EA for TVA's Predetermined Project Does Not Satisfy NEPA.</u>

TVA did not conduct the required NEPA analysis for its critical decision to retrofit the Gallatin Plant, as described above, and did not rectify this error when it prepared the EA for its predetermined decision.

**A.**    **TVA Did Not Consider the Environmental Impacts of Alternatives.**

While TVA states that the EA provides "brief discussions" of alternatives, the Agency fails to address Plaintiffs' key point: TVA did not discuss the environmental *impacts* of any reasonable alternatives, and therefore violated 40 C.F.R. § 1508.9(b) (requiring agencies to discuss alternatives and the environmental impacts of alternatives in an EA). *See also Flaherty v. Bryson*, 850 F. Supp. 2d 38, 72 (D.D.C. 2012) (rejecting an agency's EA because it "demonstrates a total failure to consider the environmental impacts of alternatives"). Even in *City of Bridgeton v. FAA*—a case cited by TVA—the agency devoted "more than two hundred pages to a comparison of the *environmental impacts* of . . . the three alternatives considered in detail." 212 F.3d 448, 459 (8th Cir. 2000) (emphasis added).[4]

TVA also insists that the stated purpose and need for the project is not overly narrow. TVA Resp., Doc. 56, PageID 1742. In doing so, TVA mischaracterizes Plaintiffs' argument: Plaintiffs agree that TVA's stated purpose is facially acceptable, but it is TVA's *interpretation* of this purpose that is problematic. TVA interprets the project purpose to rule out consideration of every alternative besides retrofitting the plant, AR 272, which even the cases cited by TVA

---

[4] In a footnote, TVA claims that it "considered the negative effects of hydraulic fracturing," also known as "fracking." TVA Resp., Doc. 56, PageID 1741 n.5. The only statement in the EA about fracking is the obvious point that there are "concerns [about] the environmental impacts of fracking," AR 454. TVA does not identify or describe any of these concerns, compare the impacts of fracking to the impacts of coal mining, or provide anything close to a sufficient comparison of this alternative to retrofitting the plant. *Id.* To the extent that TVA is attempting to offer this vague statement on fracking as a substitute for the required NEPA alternatives analysis, it is woefully inadequate.

recognize is impermissible.  *See City of Bridgeton*, 212 F.3d at 458 (explaining that agencies

cannot "define[] the project's purpose in terms so unreasonably narrow as to make the FEIS 'a

foreordained formality'"); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1239 (10th Cir. 2004) (agencies

can use reasonable selection standards for alternatives, "as long as these standards are not 'so

narrowly define[d] . . . that they unnecessarily limit consideration to the proposal initially

favored by proponents'" (citation omitted)).

TVA now argues for the first time in its response brief that, while retirement of the

Gallatin units is reasonable, it is not viable.  *See* TVA Resp. Br., Doc. 56, PageID 1743.  It is

difficult to discern what TVA means by this distinction, and TVA cannot point to any authority

showing that reasonable alternatives do not need to be considered if they are somehow not

"viable."  *Id.* at 1743; *see also Lee*, 354 F.3d at 1239 ("[T]he obligation to discuss reasonable

alternatives 'applies equally to EAs and EISs.'" (citation omitted)).

Moreover, TVA's own studies disprove its litigation position that retirement is not

viable.[5]  The previously undisclosed 2010 Unit Group Rankings and 2011 Final Fleet

Recommendations show that TVA could retire the Gallatin coal units and address any electricity

supply and reliability concerns through technologically and economically feasible transmission

upgrades or combined cycle natural gas replacement at the Gallatin site.  AR 19040–42, 19049,

---

[5]  TVA argues that the Court should overlook TVA's failure to consider the environmental
effects of alternatives because Gallatin is a "critical baseload plant and needed source of
sufficient voltage for the greater Nashville area."  TVA Resp., Doc. 56 at Page ID 1743.  Courts
have repeatedly held, however, that "the spectre of a power crisis 'must not be used to create a
blackout of environmental consideration in the agency review process.'"  *Citizens For Clean Air,
Inc. v. U.S. Army Corps of Eng'rs*, 349 F. Supp. 696, 708 (S.D.N.Y. 1972) (holding that "NEPA
may not be circumvented even in the face of [a] 'national power crisis,'") (citing *Greene Cnty.
Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412, 422–23 (2d Cir. 1972); *Calvert Cliffs'*, 449
F.2d at 1127–28).

19071. These alternatives are therefore "viable," even if TVA would prefer to retrofit Gallatin based on its analysis of economic merits alone.

TVA also misses the point of Plaintiffs' argument by reiterating its reasons for dismissing natural gas as an alternative. TVA Resp., Doc. 56, PageID 1741 n.5. Plaintiffs do not question TVA's speculation about future natural gas prices; rather, Plaintiffs contend that TVA should have taken into account the environmental effects of alternatives when weighing these economic considerations, as required by NEPA. *See* 40 C.F.R. § 1508.9(b).

**B.     TVA Failed to Consider the Harmful Effects of Its Decision.**

TVA now admits that neither its 2011 IRP nor the associated EIS addresses the environmental impacts caused by its continued operation of the Gallatin Plant and points to the Gallatin EA as "deliver[ing] on the 'site-specific' environmental analyses promised by the IRP." TVA Resp., Doc. 56, PageID 1737. TVA also acknowledges that the EA did not consider the Gallatin coal units for retirement and, thus, uses as a baseline continued operation of the units without pollution controls. AR 273; 253. From this flawed starting point, TVA "analyzes the impacts that Gallatin's continued operation as a ***controlled*** coal plant would have on various environmental sectors." TVA Resp., Doc. 56, PageID 1737. (emphasis in original). TVA thus limited its analysis to "an extensive discussion of . . . the ***positive*** health effects of its actions," *Id*. at 1744. But NEPA requires more. TVA must also identify and analyze the harmful effects of prolonging operation of the Gallatin coal units for an additional twenty years beyond 2017, when it must cease operating as an uncontrolled plant.

TVA continues to ignore the fact that the Gallatin plant cannot operate "as is" past 2017. *See* TVA Resp., Doc. 56, PageID 1744–45; Pls.' Mem., Doc. 51, PageID 1649–1651. While TVA claims that the new control equipment "would remove the pollutants that inevitably result from electricity production from the environment," *id*. at PageID 1746, the generation and

release of pollutants by the Gallatin plant after 2017 is not inevitable.  In fact, but for the

proposed retrofit, the plant could not legally operate beyond 2017 and no pollutants would be

released beyond that date.

Based on the fiction that the plant could continue to operate without controls after 2017,

TVA characterizes the ongoing emission of 4,442 tons of sulfur dioxide, 1,100 pounds of

nitrogen oxides, and 39.2 pounds of mercury every year, AR 331, 9412, as "beneficial effects,"

simply because the new control equipment will reduce the volumes of such emissions compared

to prior, uncontrolled pollution levels.  TVA Resp., Doc. 56, PageID 1744–45.  Similarly, a

determination that the Project "would reduce both water withdrawal and discharge rates from

current operations" presents an incomplete and inaccurate picture.  *Id.* at PageID 1747.  Without

the installation of equipment that makes continued operation of the plant possible, water

withdrawals and wastewater discharges would cease by 2017.  TVA did not identify and evaluate

these significant adverse effects on the human environment and compare them to a proper

baseline of cessation of pollution-generating operations after 2017 or the reasonable and

environmentally preferable alternatives of retirement or repowering.  In failing to do so, TVA

violated NEPA's basic purpose.

### C.    TVA Provides No Record Evidence to Support Its Segmentation Argument.

In support of its decision to segment consideration of the South Rail Loop ("SRL")

Landfill, TVA claims that many factors make this project component "sufficiently uncertain."

TVA Resp., Doc. 56, PageID 1743.  But the only uncertainty is whether the SRL Landfill will

become necessary in seven years, fifteen years, or somewhere in between, since TVA's

undisputed calculations—based on the factors TVA considered in the EA—show that the twenty-

year lifespan of the Project will exceed the seven- to fifteen- year lifespan of the North Rail Loop

("NRL") Landfill.  AR 262–64.  Nowhere does TVA provide a different estimate or address the

fact that the numbers in the record simply do not add up. *See* TVA Resp., Doc. 56, PageID 1743; TVA Reply, Doc. 54, PageID 1719. Instead, TVA states that "because the North Landfill is estimated to have a useful life of between seven and fifteen years" based on a number of uncertainties, the SRL Landfill will not be "automatically trigger[ed]." TVA Reply, Doc. 54, PageID 1719 (incorporated in TVA Resp., Doc. 56, PageID 1743). TVA's conclusion does not follow from its premise, and this reasoning reveals only that the SRL Landfill will be automatically triggered in seven to fifteen years. Under 40 C.F.R. § 1508.25(a)(1), then, TVA erred by failing to consider the SRL Landfill in its NEPA analysis.

TVA's attempt to omit a necessary component of the Project does not resemble the situation in *Kleppe v. Sierra Club*, 427 U.S. at 410 n. 20, a case that pre-dates the applicable NEPA regulations requiring agencies to consider connected actions together, *see* 40 C.F.R. § 1508.25(a)(1). In *Kleppe*, the Court held that an agency did not need to prepare a region-wide EIS for separate, unrelated coal mining projects, some of which were purely speculative at the time of the agency's NEPA analysis. *Id.* at 401, 410 n. 20. As described above, the SRL Landfill is an integral Project component, not a speculative or unrelated project located elsewhere in the region. AR 262–64.

The Court in *Kleppe* also found that approval of the proposed mining projects would not commit the agency to approval of subsequent mining projects in the future. *Kleppe*, 427 U.S. at 414 n. 26. Here, on the other hand, TVA's decision to go forward with the Project does commit the agency to the SRL Landfill, since the lifespan of the Project will exceed the lifespan of the

NRL Landfill, and TVA has already sited the SRL Landfill and rejected all other alternate landfill locations.[6]  AR 262–64, 271–72.

## IV.    TVA Should Have Prepared an EIS for the Gallatin Project.

In its EA and in its briefing, TVA focuses on the beneficial aspects of reducing emissions of some air pollutants from the Gallatin plant as a basis for refusing to conduct a full environmental review and prepare an EIS.  *See* TVA Resp., Doc. 56, PageID 1744–45.  But the major federal action at issue here—TVA's decision to continue operating the Gallatin coal units for an additional 20 years—would cause significant adverse environmental impacts requiring preparation of an EIS.  *See* Pls.' Mem., Doc. 51, PageID 1649–52; Pls.' Resp., Doc. 52, PageID 1700–01.  TVA should have prepared a full EIS because the Project is an indispensable requirement for continued operation beyond 2017 of a major power generating facility and because it is a major action with highly controversial environmental impacts.  *See* TVA NEPA Procedures § 5.4.1, 40 C.F.R. § 1508.27(b)(4); *see also* Pls.' Mem., Doc. 51, PageID 1651; Pls.' Resp., Doc. 52, PageID 1701–03.

TVA argues that its NEPA Procedures create a presumption for the preparation of an EIS only in cases of new construction, and that Plaintiffs' contention that an EIS is required for the retrofit in this case "would result in almost continuous issuance of EISs for routine maintenance

---

[6]  Although the Court in *Kleppe* notes that NEPA "speaks solely in terms of *proposed* actions," 427 U.S. at 410 n. 20 (emphasis in original), subsequent NEPA regulations defined "proposed actions" to include situations where an agency has effectively proposed an action, even though the agency has not yet announced an official proposal.  40 C.F.R. § 1508.23 ("A proposal may exist in fact as well as by agency declaration that one exists.").  The SRL Landfill is part of TVA's proposal because TVA's uncontroverted estimates show that the SRL Landfill will become necessary during the life of the Project.  Moreover, "even if a foreseeable, future action is not a proposed action . . . the cumulative impacts of this foreseeable action nevertheless must be analyzed" with the proposed action.  *Texas Comm. on Natural Res. v. Van Winkle*, 197 F. Supp. 2d 586, 617 (N.D. Tex. 2002); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988) ("Both connected actions and unrelated, but reasonably foreseeable, future actions may result in cumulative impacts.").

and rehabilitation projects at TVA's myriad . . . facilities." *See* TVA Resp., Doc. 56, PageID

1745. Contrary to TVA's mischaracterization, Plaintiffs do not argue that a full EIS must be

prepared for every routine maintenance project at power generating facilities, or that this project

is routine. This is not a case of routine repair or maintenance. Rather, NEPA calls for a full

analysis of the impacts of this major retrofit project because it will cost more than one billion

dollars; it will enable a major power generating source to operate for an additional twenty years;

and it will cause adverse environmental impacts that would not otherwise occur.[7]

In refusing to consider any alternative to retrofitting the Gallatin Plant, TVA also claims

it struck a balance between environmental impacts, the need for reliable and economical

electricity, and impacts on local economic development. *See* TVA Resp., Doc. 56, PageID

1745–48. But agencies cannot rely on competing public demands to excuse violations of NEPA.

*Citizens For Clean Air, Inc. v. Corps of Engineers, U.S. Army*, 349 F. Supp. 696, 708 (S.D.N.Y.

1972) ("Our sympathy for the Corps in making a difficult choice between what it doubtless saw

as competing public demands does not permit us to excuse compliance with NEPA."). To the

contrary, in this instance, "[w]hen the federal agency is initiating its own proposal, NEPA is

more demanding." *Kleppe v. Sierra Club*, 427 U.S. 390, 419 n.1 (1976) (holding that when the

project proponent is also the reviewing agency, NEPA is "intended to assure (environmental)

consideration during the development of (the) proposal" (citation omitted)).

---

[7] In their comments on the Draft EA, Plaintiffs also detailed extensive flaws in TVA's methodology in conducting its NEPA review—*i.e.*, comparing the impacts of the continued operation of a retrofitted plant against the impacts of the continued operation of a plant without air pollution controls. These comments "cast substantial doubt on the adequacy of the [agency's] methodology and data." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001).

TVA relies on three cases to urge this Court to excuse it from the obligation to prepare an EIS and, instead, to defer to the agency's expertise in balancing trade-offs dictated by its statutory mission. In each of those cases, however, the agency in question made the decision to go forward with the proposed action only after fully analyzing the environmental impacts and identifying risks through NEPA. Only then did the agencies weigh the potential environmental harm against the benefits expected in light of the greater mission of the agency. *See Marsh v. Oregon Natural Resource Council*, 490 U.S. 360, 368 (1989) (the Army Corps of Engineers complied with NEPA where it had performed a full EIS that had taken a sufficiently hard look at both the cumulative impacts of three existing dams on the river and the individual impacts of the proposed new dam); *Sierra Club v. Espy*, 38 F.3d 792, 800–01 (5th Cir. 1994) (upholding nine EAs where each considered a "no action" alternative, and two or more alternative projects in addition to the agency's preferred forest management plan); *California v. Dep't of Agric.*, No. 2:05-cv-0211-MCE-GGH, 2008 WL 3863479 at *18–20 (E.D. Cal. Sept. 3, 2008) (finding that the Forest Service took the requisite hard look at the impacts of forest management activities on certain species where it undertook modeling, fully disclosed the models' assumptions, and even disclosed potential errors in the modeling projections, and prepared a full EIS). In contrast to the agency's analyses in those cases, TVA cannot sidestep NEPA in this case and claim to have weighed the costs and benefits of an action without ever having fully identified the environmental impacts or conveyed that information to the public.

Here, TVA chose to retrofit Gallatin without weighing the environmental impacts in a public process. TVA did not compare the environmental impacts of retrofit to the impacts of other reasonable alternatives like retirement or repowering. TVA cannot be said to have struck a

balance between its mission objectives when the agency never engaged in the required NEPA analysis to determine what the environmental impacts of retrofit might be.

Every federal agency has a mission that may be weighed against environmental impacts, but the NEPA analysis must be done as an initial step to any such balancing. Without a robust and public analysis of the environmental impacts of retrofit, along with a comparison of those impacts to reasonable alternatives, there is simply no way to make a reasoned and fair decision weighing those impacts against TVA's other objectives—providing reliable, low-cost electricity and assisting state and local governments with economic development. Had TVA done a thorough job of considering the real environmental impacts of its decision to retrofit and continue operating the Gallatin coal units, it might well have determined that the scales tipped toward retirement and development of clean energy resources. As it stands, without the proper NEPA assessment, TVA found that "it is a close question whether to proceed with the projects." AR 537.

## CONCLUSION

For all the reasons set forth above, Plaintiffs request that this Court grant summary judgment in favor of Plaintiffs, set aside TVA's decision to retrofit and continue operating the Gallatin Plant, and require TVA to prepare an EIS that meets the requirements of NEPA.

Respectfully submitted this 18th day of November, 2013.


s/Nathan Moore
Nathan Moore, Staff Attorney
TN BPR # 31239
John Suttles, Senior Attorney
*Admitted Pro Hac Vice*
Delta Anne Davis, Managing Attorney
*Admitted Pro Hac Vice*
(Permanent Application Pending)
Myra Blake, Associate Attorney
*Admitted Pro Hac Vice*
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, TN 37213
Telephone: (615) 921-9470

Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, and Sierra Club

s/Mary Whittle
Mary Whittle
*Admitted Pro Hac Vice*
EARTHJUSTICE
1617 John F. Kennedy Blvd., Suite 1675
Philadelphia, PA 19103
Telephone: (215) 717-4524

Bridget Lee
*Admitted Pro Hac Vice*
EARTHJUSTICE
156 William Street, Suite 800
New York, NY 10038
Telephone: (212) 845-7379

Attorneys for Plaintiffs Tennessee
Environmental Council, Tennessee Scenic
Rivers Association, Sierra Club, and Center for
Biological Diversity

## CERTIFICATE OF SERVICE

I certify that on November 18, 2013, the foregoing Plaintiffs' Reply in Support of Motion for Summary Judgment on the Administrative Record was filed electronically through the Court's ECF system. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

s/Nathan Moore
Nathan Moore
TN BPR # 31239
SOUTHERN ENVIRONMENTAL LAW CENTER
2 Victory Avenue, Suite 500
Nashville, Tennessee 37213
Telephone: (615) 921-9470
Facsimile: (615) 921-8011