UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| TENNESSEE ENVIRONMENTAL COUNCIL, | ) | |
| TENNESSEE SCENIC RIVERS ASSOCIATION, | ) | |
| SIERRA CLUB, and | ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 3:13-CV-374-TAV-HBG |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action is before the Court on cross motions for summary judgment.

Defendant Tennessee Valley Authority ("TVA") has filed a Motion for Judgment on the

Administrative Record [Doc. 46] and plaintiffs have also filed a Motion for Summary

Judgment on the Administrative Record and Request for Hearing [Doc. 50]. Plaintiffs have

responded in opposition to defendant's motion [Doc. 52], and defendant replied [Doc. 54].

Defendant has also responded in opposition to plaintiffs' motion [Doc. 56], and plaintiffs

have replied [Doc. 57]. After careful consideration of the parties' arguments, the record in

this case, and the relevant law, the Court will **GRANT** defendant's motion for summary

judgment on the administrative record and **DENY** plaintiffs' motion for summary judgment.[1]

---

[1] Plaintiffs have requested a hearing on their motion for summary judgment [*see* Doc. 50]. The Court, however, finds that the issues have been fully briefed by the parties and that a hearing on this matter will not be beneficial. Accordingly, plaintiffs' motion for a hearing will be **DENIED**.

## I.  Background

Plaintiffs commenced this action on April 25, 2013, challenging TVA's failure to undertake required environmental analysis under the National Environmental Policy Act ("NEPA"), in connection with its decision to extend the life of the Gallatin Fossil Plant (the "Gallatin Plant" or "the Plant") [Doc. 1 ¶ 1].  Plaintiffs are non-profit and volunteer organizations, incorporated both inside and outside of Tennessee, with members and volunteers who live, work, and recreate around the Gallatin Plant, and who assert that they will be directly harmed by the alleged continued water and air pollution that will result from the Life Extension Project of the Plant [*Id*. ¶¶ 9–23].

The Gallatin Plant, located in Sumner County, Tennessee, is a coal-fired plant that burns approximately 12,350 tons of coal a day [*Id*. ¶ 40].  The Plant serves as a base load on TVA's power generation system and generates electricity for the greater Nashville area, sufficient to supply 480,000 homes [Doc. 47].  The Plant, which has been operating for fifty-four years without pollution controls, produces a combined 231,500 tons of fly ash and bottom ash waste, as well as toxic pollutants to water surfaces [Doc. 1 ¶¶ 43–47].

In June 2011, defendant entered into settlement agreements with four states and three environmental agencies, including plaintiff Sierra Club, to cure alleged violations of the Clean Air Act [Doc. 47; Doc. 51].  These agreements were entered into a Consent Decree, approved by this Court [*Id*.].  Under the Consent Decree, defendant was, with respect to the Gallatin Plant, required to: "(1) install[] an FCD system to reduce sulfur dioxide emissions and an SCR system to reduce nitrogen oxides emissions, with requirements to reduce particulate matter emissions; (2) repower[] the units with renewable biomass; or (3) retir[e]

2

the units" [Doc. 51]. Defendant was also required to reduce air pollution from the Gallatin Plant by December 31, 2017 [*Id*.]. To comply with the Consent Decree and new regulations promulgated by the United States Environmental Protection Agency ("EPA"), defendant elected to reduce emissions at the Gallatin Plant by installing emission controls [Doc. 47].

On August 18, 2011, the TVA Board of Directors approved the installation of "dry scrubbers, baghouses, a selective catalytic reduction system, and associated equipment" at the Gallatin Plant, with a budget of up to $1.1 billion [AR Doc. 1]. The Board resolution further expressly provided that the "implementation of the Board action will be subject to satisfactory completion of all required environmental reviews under [NEPA] and other applicable environmental reviews" [*Id*.].

Before entering into the Consent Decree, defendant generated an Integrated Resource Plan ("IRP") and an associated Environmental Impact Statement ("EIS") for the IRP [*See* AR Docs. 10, 11, 12]. The IRP "sought to further diversify TVA's generation resources by expanding energy efficiency and demand side options, pursuing cost effective renewable energy, increasing the contribution of nuclear and natural gas generation and reducing its reliance on generation from older, coal-fired power plants" [Doc. 47]. The IRP and associated EIS, however, did not make facility-specific decisions, and provided that specific environmental reviews would be conducted before final implementation decisions were made [Doc. 51]. Based on the goals identified in the IRP, defendant analyzed the Gallatin Life Extension Project (the "Gallatin Project") in an Environmental Assessment ("EA") [Doc. 47].

3

Defendant prepared and released a draft EA for the Gallatin Project in October 2012 [AR Doc. 6]. Defendant also published three requests for public comments in local newspapers [*See* AR Docs. 3, 4, 5]. Defendant released the draft EA for a thirty-day public comment period, subsequently extended it for an additional fourteen days, and accepted late comments, giving the public a total of sixty-one days to comment on the draft EA [Doc. 47]. In March 2013, defendant released a final EA, [AR Doc. 7], and on March 11, 2013, defendant released a Finding of No Significant Impact ("FONSI") [AR Doc. 8].

Plaintiffs subsequently brought this action asking the Court to invalidate defendant's decision to undertake the Gallatin Project and enjoin defendant from taking any further action to implement the Gallatin Project until it has complied with NEPA [Doc. 1 ¶ 6]. Plaintiffs assert that defendant has violated NEPA by: (1) predetermining the NEPA result; (2) committing resources before completing the NEPA process; (3) failing to prepare an EIS for the Gallatin Project; (4) failing to consider a legitimate no-action alternative; (5) failing to examine reasonable alternatives to the Gallatin Project; (6) improperly segmenting its analysis of the project; and (7) failing to allow for public comment [Doc. 1].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most

4

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

"Summary judgment . . . is a particularly useful method of reviewing federal agency decisions[, as here,] because 'the sole question at issue [is] a question of law,' and the underlying material facts are contained in the administrative record." *Lone Tree Council v. U.S. Army Corps of Eng'rs*, No. 06-12014-BC, 2007 WL 1520904, at *11 (E.D. Mich. May 24, 2007) (second alteration in original and citation omitted). "The Court's role is to determine whether judgment as a matter of law is appropriate for either party, in light of the standard of review prescribed by [NEPA] and interpretive case law of an agency's decision not to prepare an EIS." *Id.*

## III.    Analysis

NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment[, and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To that end, NEPA requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989); 42 U.S.C. § 4332(2)(C). NEPA also requires that federal agencies follow the necessary process in assessing the environmental effects of projects; it does not, however, mandate a specific result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 23, 227–28 (1980). In other words, NEPA's mandate is essentially procedural. *Id.*

6

A primary provision of NEPA is the requirement that all federal agencies prepare an EIS for "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.15; *Sw. Williamson Cnty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 274 n.3 (6th Cir. 2001). "Major" has no meaning independent of "significantly," and "actions" "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18. An EIS is the most detailed and comprehensive level of review under NEPA regulations. *See* 40 C.F.R. § 1508.11; *see also* 40 C.F.R. Part 1502.

Prior to preparing an EIS, the agency may, however, prepare an EA as a preliminary step in determining whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS. *See* 40 C.F.R. § 1508.9(a)(1). "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (alterations in original) (quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to [an] EA, an agency determines that an EIS is not required under applicable [regulations issued by the Council on Environmental Quality ("CEQ")], it must issue a '[FONSI]' which briefly presents the reasons why proposed agency action will not have a significant impact on the human environment." *Id*. at 757–58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

Federal courts have jurisdiction to review NEPA claims only pursuant to the Administrative Procedure Act (the "APA"), 5 U.S.C. § 704. *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997). It is well settled that a reviewing court grants substantial deference to an agency's determination under NEPA, including decisions regarding what level of environmental review is needed. Such a determination will be upheld so long as the determination was not arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 412 (1976); *Marsh*, 490 U.S. at 376; *Slater*, 120 F.3d at 632 (indicating that an agency's determination may be set aside if it is "otherwise not in accordance with the law"); *Tenn. Clean Water Network v. Kempthorne*, No. 3:05-CV-214, 2007 WL 2220414, at *4 (E.D. Tenn. July 27, 2007). In other words, an agency's decision must be "reasonable under the circumstances" when reviewed "in the light of the mandatory requirements and the standard set by (NEPA)." *Kelley*, 42 F.3d at 1519 (alteration in original and citation omitted). "'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted).

In engaging in its review, a court cannot "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelley*, 42 F.3d at 1518 (internal quotation marks and citation omitted). A court must, however, "determine whether the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Id.* (internal

quotation marks and citation omitted). At bottom, the review is a "narrow one." *Marsh*, 490 U.S. at 378.

### A.     Predetermination of Decision and Premature Commitment of Resources

Plaintiffs claim that defendant predetermined its decision to retrofit the Gallatin Plant and already began committing resources to the project before ever beginning the NEPA process [Doc. 1 ¶¶ 104–16]. According to plaintiffs, this predetermination and premature commitment of resources kept defendant from taking NEPA's requisite "hard look" at the environmental impacts of its decisions, and also prejudiced TVA's selection of reasonable alternatives [*Id.* ¶¶ 108, 115].

The purpose of NEPA is "to help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). As such, until a public record of decision, as required by the act, is provided, agencies are prohibited from taking any action that would "have an adverse environmental impact or limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). NEPA, however, also provides that "[a]gencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2. To that end, courts have found that to meet the high standard of predetermination, a plaintiff must show that an "agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis— which of course is supposed to involve an objective, good faith inquiry into the

9

environmental consequences of the agency's proposed action." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).

Plaintiffs base their argument for predetermination on the grounds that TVA executed contracts for final design and construction before completing its NEPA review, that the TVA board approved, and its staff began implementing, the project in 2011, that TVA made its decision to undertake the project without public participation, and that TVA ordered the TWRA to dismantle the aquatic center prior to its NEPA review [Docs. 50, 52]. Defendant contends that the contracts, design work, system planning analysis, contingent board approval, and aquatic center planning were actions that helped to inform the environmental review process, and did not constitute an irreversible or irretrievable commitment to a plan of action [Doc. 47].

NEPA does not require subjective impartiality. *See Forest Guardians*, 611 F.3d at 712. In fact, "[a]n agency can have a preferred alternative in mind when it conducts a NEPA analysis." *Id*. As such, "[t]he proper inquiry in a NEPA case is therefore not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has 'limited the choice of reasonable alternatives.'" *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (quoting 40 C.F.R. § 1506.1(a)(2)). It is proper for agencies to engage in design and engineering work and take minor steps toward a course of action that the agency initially prefers. *See id*. at 205 (finding that it was proper for the defendant to engage in beginning design and engineering work to allow the EIS provide greater specificity on the project's environmental impacts); *see also Forest Guardians*, 611 F.3d at 718 (finding that the grant

10

agreement that the defendant entered into before the NEPA analysis was completed did not constitute a binding contract that firmly committed the defendant to a course of action dependent on the outcome of the NEPA analysis).

Here, defendant entered into a series of contracts prior to completion of the NEPA process [*See* AR Docs. 273, 311, 314, 318].  The record indicates that these contracts, however, committed defendant only to the initial design and engineering work that was necessary to defendant's adequate performance of the environmental review process [*See* Doc. 47].  Particularly, the contracts provided that major work would be postponed until the proper environmental reviews were completed and left discretion on timing and termination to defendant [*Id.*; AR Doc. 273 at Page ID 13956–58; Doc. 311 at Page ID 14732–33; Doc. 314 at Page ID 15068–70; Doc. 318 at Page ID 16642–43].

Plaintiffs rely on the Sixth Circuit's opinion in *Burkholder v. Peters*, 58 F.App'x 94 (6th Cir. 2003), to support their position that the contracts defendant entered into were impermissible [Doc. 50].  In *Burkholder*, the Sixth Circuit stated that the defendant violated NEPA by entering into a contract for final design work before the completion of the EA and the issuance of a FONSI.  58 F.App'x at 97.  This is sufficiently distinguishable from TVA's pre-NEPA contracts because TVA's contracts were not for final design work and were all made contingent on completion of the required environmental reviews [*See* Doc. 47].[2]  *But cf. Metcalf v. Daley*, 214 F.3d 1134, 1145 (9th Cir. 2000) (finding that defendants had made an irreversible and irretrievable commitment of resources prior to completing the NEPA

_____

[2] Furthermore, the Court notes that the Sixth Circuit's analysis in *Burkholder* concerned a conflict of interest between the state department of transportation and its contractor and whether there was sufficient independent oversight to cure procedural violations.  58 F.App'x at 97.  As such, the Court finds that the holding in *Burkholder* is inapposite.

11

process by entering into two agreements binding them to support the Makah Tribe's proposal).

Regarding plaintiffs' argument that defendant's instruction to the TWRA to move the aquatic center prior to the NEPA process was evidence of predetermination, defendant argues that it notified the TWRA of a "potential land use conflict" and worked with the TWRA to find alternative sites for the aquatic center [Doc. 47]. Defendant further argues that in any event, any NEPA violation in prematurely moving the aquatic center was harmless because the procedural violations were remedied [*See* Doc. 54 (citing *Bukholder*, 58 F.App'x at 100–02)]. The Court finds that the decision to move the aquatic center does not indicate predetermination on TVA's part; rather, defendant's actions with the aquatic center constituted planning that was permissible to integrate with the NEPA process. *See Nat'l Audubon Soc'y*, 422 F.3d at 205 (stating that "[o]ne cannot expect an agency in all cases to neatly proceed from environmental analysis to planning."). The Court will not hold "that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the *possibility* that a particular environmental outcome would be the result of its NEPA review of environmental effects." *Forest Guardians*, 611 F.3d at 715.

Accordingly, the Court finds that plaintiffs have failed to meet the rigorous standard of establishing that defendant has made an irreversible and irretrievable commitment of

resources to its decision to retrofit the Gallatin Plant. At most, the evidence indicates that defendant had a preferred alternative.[3]

### B. "No-Action" Alternative

Plaintiffs also claim that defendant's NEPA analysis was deficient because defendant considered an illegitimate "no action" alternative thereby obscuring the magnitude of the harmful environmental impacts of its decision [Doc. 1 ¶ 126]. Particularly, plaintiffs allege that defendant failed to consider the proper "no action" alternative to the Gallatin Project by asserting that the no-action baseline consists of running the Plant uncontrolled in perpetuity rather than taking into account the fact that under the consent decree, the Plant would not operate past 2017 [*Id*. ¶¶ 129–30].

NEPA requires an agency to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. As part of this analysis, agencies are required to "include the alternative of no action." § 1504.14(d). "In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo. In other words, the

---

[3] Plaintiffs also argue that predetermination here is proven by the TVA Board's approval of the Gallatin Project before any NEPA analysis was conducted [Doc. 52]. The Court, however, finds that this NEPA-contingent approval does not rise to the level of an irreversible and irretrievable commitment of resources. Rather, it merely shows defendant's preferred alternative. Practically speaking, it would not be economical for defendant to wait until it has completed lengthy environmental analysis to discover that its preferred alternative would not be approved. *See Nat'l Audubon Soc'y*, 422 F.3d at 205.

13

current level of activity is used as a benchmark." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (internal citations omitted).

Plaintiffs argue that defendant's use of a "no action" baseline that assumed the continued operation of the Plant without any pollution controls is improper because it does not take into account the legal reality presented by the consent decree—i.e., that the Plant cannot operate beyond 2017 without pollution controls [Doc. 52]. They further assert that by using the improper "no action" alternative, defendant evaded consideration of the significant impacts that would result from the project [Doc. 51]. Conversely, defendant argues that although it could not legally operate the Plant without emission controls after 2017, it utilized the proper "no action" alternative because the "no action" alternative must reflect the current status quo and not a future reality [Doc. 47].

Plaintiffs' argument, while appealing, fails to address the CEQ's directive on what constitutes a proper "no-action" alternative. In addressing the appropriate "no-action" alternative, the CEQ has said that in instances involving federal decisions on proposal for projects:

> 'No action' . . . would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.
>
> . . .
>
> Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of

14

the agency which must be analyzed [under 40 C.F.R. § 1502.14(c)].

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981). The Court is persuaded by defendant's argument that the plain language of this directive requires defendant to employ a "no action" alternative of the status quo, as opposed to the future consequences of the consent decree.

Defendant's position is further bolstered by the CEQ's requirement to evaluate known consequences of the "no action" alternative. The CEQ provides that "[w]hen a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis." *Id*. Here, defendant's analysis of the "no action" alternative references that its continuation of operation in the Gallatin Plant would not comply with the applicable environmental requirements and acknowledges that it would have to shut down the Plant after 2017 [*See* AR Doc. 7 at Page ID: 253, 466].

The Court finds that defendant's use of the status quo—that is, the continued operation of the Plant without emission controls—as the "no action" alternative, coupled with the acknowledgement of the consequences of the "no action" alternative, comports with the CEQ's requirement under NEPA.

## C. Reasonable Alternatives to Life Extension Project

Plaintiffs next claim that defendant violated NEPA and the APA by failing to examine reasonable alternatives to the Gallatin Project [Doc. 1 ¶¶ 134–39]. Plaintiffs maintain that defendant failed to consider the alternatives to retire the Plant in whole or in part, or the alternative to replace some of the coal units with energy efficient alternatives [*Id.* ¶¶ 135–36]. Plaintiffs further allege that, instead, defendant merely explored variations of a

single alternative, and summarily dismissed other alternatives that it had agreed were reasonable in the consent decree [*Id.* ¶ 137; Doc. 52]. In response, defendant argues that under NEPA, it is required only to evaluate reasonable alternatives [Doc. 47]. Defendant contends that alternatives that are reasonable are those that are consistent with the agency's stated purpose of the project [*Id.*].

NEPA requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." § 1502.14(a). "NEPA does not dictate the nature of the alternatives that must be considered by the [agency]." *Latin Ams. for Soc. & Econ. Dev. v. Fed. Highway Admin.*, Nos. 12-1556, 12-1558, 2014 WL 2782011, at *21 (6th Cir. June 20, 2014). Rather, "what alternatives will be considered is a determination for the agency to make." *Id.* (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978)). An "alternative is reasonable only if it will bring about the ends of the federal action." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). A court will "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and [will] uphold its discussion of alternatives as long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196. This discretion, however, is not unbridled. "[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Id.* (citing *City of New York v. Dep't of Transp.*,

16

715 F.2d 732, 743 (2d Cir. 1983)). Rather, "agencies must look hard at the factors relevant to the definition of purpose." *Id.*

Plaintiffs' argument is two-fold. First, plaintiffs argue that defendant has construed its project purpose so narrowly as to exclude meaningful consideration of any alternative other than retrofitting and continuing to operate the Gallatin coal units [Doc. 52]. Plaintiffs argue that, as such, defendant did not give detailed consideration to a broad range of reasonable alternatives as is required by NEPA [*Id.*]. Second, plaintiffs contend that defendant failed to inform the public how retaining the Gallatin Plant as a coal plant would maintain a more-balanced portfolio in defendant's coal-intensive fleet, and that defendant failed to discuss the environmental effects of the alternatives that it had eliminated as unreasonable [Doc. 51].

Defendant's purpose and need statement provides that:

> The purpose and need for the proposed actions are:
>
> Complying with U.S. Environmental Protection Agency's . . . new Utility Mercury and Air Toxics Standards (MATS) and other anticipated regulations including requirements affecting the management of coal ash and other residues from the combustion of coal,
>
> Complying with a Federal Facilities Compliance Agreement . . ., and
>
> Achieving and maintaining a more balanced portfolio of energy resources on the TVA power system.

[AR Doc. 7 at Page ID 241]. While an agency may not define its objectives in unreasonably narrow terms, considerable discretion is afforded to agencies to define the purpose and need of a project. *See Citizens Against Burlington, Inc.*, 938 F.2d at 196; *see also Friends of*

17

*Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998) (acknowledging that while agencies are afforded discretion in defining the need an purpose of projects, they may not define the objectives in terms that are unreasonably narrow). An agency's purpose and need statement is "evaluated under a reasonableness standard." *Id*. at 1067. Defendant's objective to "maintain[] a more balanced portfolio of energy resources" was identified in defendant's 2011 IRP [AR Doc. 7 at Page ID 241]. This objective, in turn, took into account the future demand for electricity by defendant's customers, the potential supply side options for meeting future demand, capital and fuel costs, reliability, compliance with existing and future regulations, and environmental impacts [AR Doc. 14 at Page ID 1224]. This statement of purpose and need allowed defendant to identify a broad range of alternatives, including the no-action alternative, and discuss them in varying depth as necessary to achieve defendant's objectives. Reviewing defendant's stated purpose under a reasonableness standard as the Court is required to do, and given the level of deference given to an agency's defined need for a project, the Court finds that defendant's statement of purpose and need is not unreasonable.

Relying on *Muckleshoot Indian Tribe v. United States Forest Service*, 177 F.3d 800 (9th Cir. 1999), plaintiffs argue that defendant failed to consider adequate alternatives by merely evaluating a no-action alternative along with two virtually identical alternatives [Doc. 52]. Yet, the record shows that defendant's consideration of the alternatives was not a mere choice between two identical alternatives. Rather, the record demonstrates that defendant considered a total of nine alternatives in addition to its preferred alternative and the no-action alternative. Defendant did not summarily dismiss the other alternatives, as plaintiffs suggest;

instead, defendant, in the EA, provided a brief discussion of each alternative and explained why these alternatives were eliminated—that is, because they did not meet defendant's project's objective [Doc. 47; AR Doc. 7 at Page ID 271–74]. Defendant's decision to reject these alternatives and only discuss them briefly is proper under NEPA. *See Buck Mountain Cmty. Org. v. TVA*, 629 F. Supp. 2d 785, 798 (M.D. Tenn. 2009) (citing *Slater*, 120 F.3d at 637).

Furthermore, the Court finds that *Muckleshoot* is distinguishable from the present case. In *Muckleshoot*, the defendant initially identified five alternatives and a no-action alternative. 177 F.3d at 813. The defendant then eliminated three of the alternatives from further study, and analyzed the final two and the no-action alternative. *Id*. The Ninth Circuit found that the defendant had failed to consider an adequate range of alternatives because one of the alternatives primarily eliminated from detailed study was more consistent with the defendant's basic policy objectives than the alternatives that were the subject of final consideration. *Id*. Nevertheless, the Ninth Circuit noted that NEPA does not require a defendant to "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Id*. Here, the record does not show, and plaintiffs cannot point to, any of defendant's dismissed alternatives that were more consistent with TVA's stated goals. Additionally, plaintiffs have not shown any alternatives that defendant did not consider, either in its full or limited analysis. As such, the Court does not find that plaintiffs' reliance on this case is persuasive.

In sum, considering all the evidence and evaluating each motion on its own merits, the Court cannot find that defendant failed to consider all the reasonable alternatives or that defendant's rejection of alternatives it deemed unreasonable rendered its decision arbitrary or capricious.

### D.    Segmentation of Analysis

Next, plaintiffs allege that defendant failed to analyze the full impacts of the landfills by impermissibly segmenting an integral component of the Gallatin Project [Doc. 1 ¶¶ 140–47].  In response, defendant argues that it did not impermissibly segment its analysis of the landfill with respect to the South Rail Loop because it is not required under NEPA to consider the possible environmental impacts of less imminent actions [Doc. 47].

NEPA requires an EIS to include "[c]onnected actions," which are actions that (1) automatically trigger other actions that may require environmental impact statements; (2) cannot or will not proceed unless other actions are taken previously or simultaneously; and (3) are interdependent parts of a larger action and depend on the larger action for their justification.  40 C.F.R. § 1508.25(a)(1).  "From th[is] regulation[], courts have developed an 'impermissible segmentation' rule."  *Hirt v. Richardson*, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999).  "Impermissible segmentation involves a 'major federal action' where a small part of that action has been 'segmented' in order to escape application of the NEPA process." *Id*.  "The doctrine of improper segmentation is limited, however, to proposed actions; NEPA does not require an agency to consider the possible environmental impacts of less imminent actions."  *Bullwinkel v. U.S. Dep't of Energy*, 899 F. Supp. 2d 712, 729 (W.D. Tenn. 2012)

(internal quotation marks omitted) (quoting *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 831 (E.D. Mich. 2008)).

Plaintiffs' argument that defendant impermissibly segmented its NEPA analysis in order to expedite the NEPA process or avoid addressing environmental impacts rests on plaintiff's assertion that the South Rail Loop is not less imminent or speculative as defendant claims [Doc. 52]. Rather, plaintiffs argue that the construction of the South Rail Loop is certain to occur [*Id*.]. In support of this, plaintiffs allude to the fact that the landfill has already been sited and that defendant's calculations indicate that the landfill will be necessary for waste disposal during the expected life of the project [*Id*.]. Plaintiffs also claim that defendant has segmented its analysis on the riskiest component of the project, as the South Rail Loop would be located in an area that is vulnerable to sinkholes [Doc. 51].

Defendant's decision to retrofit the Gallatin Plant requires the construction of landfills for waste disposal [AR Doc. 7 at Page ID 254]. Defendant indicated that two landfills, the North Rail Loop and the South Rail Loop, had been sited and that defendant would move forward with construction of the North Rail Loop which, depending on several factors, is expected to have an estimated life of seven to fifteen years [*Id*. at Page ID 262]. Defendant decided that the potential need for the South Rail Loop was less imminent and, therefore, concluded that it would take the necessary measures to construct the South Rail landfill if the North Rail Loop reaches capacity, and "would conduct additional environmental reviews as appropriate if [it] proposes to do this" [*Id*. at Page ID 262–64]. Defendant also provided that the timing and development of the South Rail Loop would vary based on factors such as energy, demand, the quantity of coal burned in the Gallatin Plant, and dry coal combustion

21

waste production [*Id.*; Doc. 47]. Defendant relies on the Supreme Court's holding in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976) and the Sixth Circuit's holding in *City of Riverview v. Surface Transportation Board*, 398 F.3d 434 (6th Cir. 2005), to support its argument that it was proper to segment its analysis of the South Rail Loop because it is a less imminent action [Doc. 47].

While the facts in *Kleppe* and *City of Riverview* differ slightly from those in the present case, the Court finds that the courts' holdings in these cases are nevertheless instructive. It is well settled that NEPA speaks solely in terms of proposed actions, and not less imminent or speculative actions. *See City of Riverview*, 398 F.3d at 442. The Court agrees with defendant's determination that the South Rail Loop landfill is too speculative at present. Although defendant has taken a step further than the defendants in *Kleppe* and *City of Riverview*—for example, by locating a site for the construction of the landfill—the consideration of constructing the landfill is still a less imminent action that may or may not occur. While defendant has estimated that the North Rail Loop will have a useful life of seven to fifteen years [Doc. 47], whether the North Rail Loop will actually reach capacity and whether the South Rail Loop will be needed are dependent on future energy demand, future regulation, and future pricing, none of which can be accurately determined to the point where an environmental analysis based on these estimates would be meaningful. *See e.g., City of Riverview*, 398 F.3d at 442 (citing *Crounse Corp. v. I.C.C.*, 781 F.2d 1176, 1195 (6th Cir. 1986) ("rejecting contention that NEPA requires review of contemplated changes, because such proposals 'have [not] been developed to a point where more meaningful environmental analysis of these proposals is possible'")).

22

As such, the Court finds that defendant's decision to segment its analysis of the South Rail Loop, and conduct the appropriate environmental analysis if it becomes necessary to construct the landfill in the future was not impermissible under NEPA.

### E.  Public Comment

Plaintiffs next claim that defendant violated NEPA by failing to allow for public comment [Doc. 1 ¶¶ 148–52].  Defendant has moved for summary judgment on this claim arguing that it complied with the requirements of NEPA and CEQ regulations that instruct agencies to involve the public [Doc. 47].  Defendant also argues that the Gallatin EA stems from its 2011 IRP, and the IRP EIS also provided extensive opportunity for public comment and participation [*Id*.].  In opposition, plaintiffs argue that defendant withheld from the public the economic analysis that it based its decision to retrofit the Gallatin Plant on for nearly six months after it completed the NEPA process, and that defendant's final EA contained unsupported conclusions that did not provide the public with sufficient information to review defendant's decision under NEPA [Doc. 51].  Furthermore, plaintiffs argue that defendant's 2011 IRP and the accompanying EIS did not preclude defendant from complying with NEPA for its EA, and that by the time defendant released the draft EA and invited public comment, it had already decided to continue operating the Gallatin Plant [*Id*].[4]

---

[4] Because the Court has previously decided that there is not sufficient evidence to show that defendant predetermined its decision to continue operating the Gallatin Plant, the Court does not address plaintiffs' re-assertion of the same claim under this issue.

23

CEQ regulations do not "detail the process an agency should follow when publishing an environmental assessment." *Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 272 (3d Cir. 2012) (citing 40 C.F.R. § 1508.9). "There are no notice requirements, pre-circulation requirements, or instructions about the public comment process. CEQ regulations only provide that agencies 'shall involve the public to the extent practicable, in preparing [an] environmental assessment.'" *Id*. (quoting 40 C.F.R. § 1501.4(b)].

On October 17, 2012, defendant published a notice in the Gallatin News stating that it had prepared an EA to determine the effects of installing additional air pollution control equipment at the Gallatin Plant [AR Doc. 3 at Page ID 18]. The notice solicited comments from other agencies, the general public, nongovernmental agencies, and Native American tribes [*Id*.]. The notice also provided a summary of what the proposed project would entail and included a link to where to find the draft EA [*Id*.]. Defendant also published the notice in the Tennessean and the Gallatin News Examiner on October 17, 2012, and October 19, 2012, respectively [AR Docs 4, 5]. Defendant subsequently released the draft EA for public comment for a period totaling sixty-one days [Doc. 47]. After reviewing public comments, defendant published a 172-page final EA in March 2013 [AR Doc. 7]. The final EA comprehensively addressed the key issues raised in the public comments [*Id*. at Page ID 442–98]. As such, the Court cannot find that defendant failed to sufficiently involve the public as required by NEPA.

24

## F.  Failure to Prepare an EIS

Finally, plaintiffs claim that defendant violated NEPA by failing to prepare an EIS for the Gallatin Project [Doc. 1 ¶¶ 117–24].  Plaintiffs also further claim that defendant violated its own NEPA procedures by failing to prepare an EIS because the Life Extension Project is highly controversial and is a significant modification that would allow continued operation of a major power generating facility [*Id.* ¶¶ 120–22].

NEPA requires all federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). "Generally, however, the decision not to prepare and EIS is left to the 'informed discretion' of the agency." *Providence Rd. Cmty. Ass'n v. E.P.A.*, 683 F.2d 80, 82 (4th Cir. 1982) (citing *Kleppe*, 427 U.S. at 413).  "Absent a showing of arbitrary action, we must assume the agencies have exercised this discretion appropriately." *Id.*  Where an agency is unsure whether a proposed action requires an EIS, the agency may prepare a less detailed EA.  40 C.F.R. § 1501.4(b).  The EA "has been described as a 'rough-cut, low-budget environmental impact statement.'" *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1999) (quoting *Cronin v. U.S. Dep't Agric.*, 919 .2d 439, 443 (7th Cir. 1990)).  It "functions as a screening device that allows agencies with limited resources to focus on truly important federal actions." *Id.* (internal quotation marks omitted) (quoting *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 858 (9th Cir. 1982)).  "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a [FONSI] and forego the further step of preparing an EIS." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citing 40 C.F.R. § 1501.4(e)).  "An agency's

25

decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise." *Id.* (internal quotation marks and citation omitted).

The determination of whether an action will significantly affect the quality of the environment requires an agency to "look at both the context of the action and its intensity." *Friends of Fiery Gizzard*, 61 F.3d at 504 (citing 40 C.F.R. § 1508.27 (a), (b)). "'Intensity,' § 1508.27(b) explains, means 'the severity of the impact.'" *Id.* The Sixth Circuit has found that this refers to the severity of adverse impacts and has, therefore, held that "[i]f the agency reasonably concludes, on the basis of the environmental assessment, 'that the project will have no significant adverse environmental consequences,' an environmental impact statement is not required." *Id.* at 504–05 (citation omitted). Where a project would also produce significant adverse impacts, however, the mere presence of beneficial impacts of the project is not sufficient to justify the finding of no significant impact. *Id.* Instead, an agency must, in such a case, prepare an EIS to balance the adverse effects against the projected benefits. *Id.*

Here, concerning intensity, defendant considered the intensity factors outlined in 40 C.F.R. § 1508.27(b) and determined that the Life Extension Project would not have a significant adverse impact on the environment but, rather, a beneficial impact [AR Doc. 9 at Page ID 532–33; Doc. 47]. In so doing, defendant found that the project would not affect prime farm land or wild and scenic rivers, and that other than support structures for the ductwork bridge crossing the discharge channel, there would be no effects on floodplains [AR Doc. 9 at Page ID 532]. Defendant also found that the project would reduce emissions of sulfur dioxide by 96 percent, emissions of mono-nitrogen oxides by 90 percent, and

emissions of mercury by at least 86 percent [*Id*.]. Defendant further noted that there would be no significant adverse impact to the endangered species in the proposed landfill area [*Id*.]. Finally, defendant noted that the project would not affect historic properties in the area [*Id*. at Page ID 533]. Where defendant did not make a specific finding of no significant adverse impacts, defendant noted that the impact to the environment would be insignificant [*Id*.].

Furthermore, the Court notes that the "[p]resence of enumerated intensity factors does not mandate a finding of significance; rather, the agency must establish only that it addressed and evaluated the factors." *Del. Audubon Soc. v. Salazar*, 829 F. Supp. 2d 273, 284 (D. Del. 2011) (citing *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 233–34 (5th Cir. 2006)). Here, defendant considered both context and each of the factors related to intensity and sufficiently addressed the factors before finding that there were no significant adverse impacts. Plaintiffs further claim that the EA contains only conclusory statements on why there are no significant adverse impacts and why the potential effects to the environment are insignificant [Docs. 51, 52]. The record, however, supports defendant's conclusions as to each factor.

Regarding plaintiffs' argument that defendant was required to prepare an EIS because of the highly controversial nature of the Gallatin Project, [Doc. 1 ¶¶ 120–22], plaintiffs' contend that several members of the public "submitted voluminous comments calling into question the size, nature, and effect of the project" [Doc. 52]. "Controversy in this context does not mean opposition to a project, but rather 'a substantial dispute as to the size, nature or effect of the action.'" *Hillsdale Ent'l Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012) (quoting *Middle Rio Grande Conservancy Dist. v.*

*Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002)).  A finding of controversy requires that the comments cast "substantial doubt on the agency's methodology and data." *Id*.  Regardless, "controversy is not decisive but is merely to be weighed in deciding what documents to prepare.  So even if a project is controversial, this does not mean [the agency] must prepare an EIS, although it would favor an EIS." *Id*. (internal citations and quotation marks omitted).  The record indicates that defendant was careful to address the concerns raised during the public comment period, and defendant pointed out that none of these comments cast substantial doubt on the adequacy of defendant's methodology and data [Doc. 47].  Even so, this factor, standing alone, is not enough to mandate an EIS.  *See Hillsdale*, 702 F.3d at 1181.

As the Court has previously noted, an agency's decision of whether to prepare an EIS is entitled to substantial deference.  *See Providence Rd. Cmty. Ass'n*, 683 F.3d at 82.  As such, "[t]he Court's role 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'"  *S. Four Wheel Drive Ass'n v. U.S. Forest Service*, No. 2:10CV15, 2012 WL 4106427, at *14 (W.D.N.C. Sept. 19, 2012) (quoting *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61 (D.N.H. 2007)).  The Court, therefore, finds that in making the decision to issue a FONSI and forego the preparation of an EIS, defendant adequately considered the environmental concerns and took the requisite hard look under NEPA.

## IV.     Conclusion

For the reasons explained, the Court will **DENY** Plaintiffs' Motion for Summary Judgment on the Administrative Record and Request for Hearing [Doc. 50] and **GRANT** Tennessee Valley Authority's Motion for Judgment on the Administrative Record [Doc. 46].

28

Plaintiffs' claims will be **DISMISSED** and the Clerk of Court will be directed to **CLOSE** this case.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE